**UNITED STATES of America,**
**Plaintiff-Appellant,**

**and**

**Pyramid Lake Paiute Tribe of Indians,**
**Plaintiff-Intervenor-Appellant,**

**v.**

**TRUCKEE–CARSON IRRIGATION DISTRICT, STATE OF NEVADA, Sierra Pacific Power Company, City of Reno, City of Sparks, County of Washoe, and Washoe County Treasurer, Trustee, Albert A. Alcorn, and Approximately 17,-000 Other Individually Named Persons, Firms, Partnerships, and Corporations, Defendants-Appellees.**

**Nos. 78–1115, 78–1493.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 15, 1980.

Decided June 15, 1981.

As Modified July 10, 1981.

---

Robert S. Pelcyger, Boulder, Colo., argued for Paiute Tribe; Robert D. Stitser, Reno, Nev., on brief.

Joseph J. Brecher, Oakland, Cal., Phillip Shea, Mark, Shea & Wilks, Phoenix, Ariz., Arthur Lazarus, Jr., Washington, D. C., amicus curiae.

Peter Steenland, Jr., Atty., Dept. of Justice, Washington, D. C., for the U. S.

John W. Hoffman, Reno, Nev., argued for the State of Nev.; Gordon H. De Paoli, Reno, Nev., argued for Sierra Pacific; Frederick G. Girard, Sacramento, Cal., argued for Truckee-Carson Irrigation Dist.; Paul W. Freitag, Sparks, Nev., Nada Novakovich, Jack I. McAuliffe, Maurice J. Sullivan, Robert L. Van Wagoner and Richard W. Blakey, M. Bryon Lewis and Fredrick J. Martone, Phoenix, Ariz., Jarold M. Young, Edward Reed, Thomas J. Hall, Leslie B. Gray, Reno, Nev., on brief.

Before TUTTLE,** SKOPIL, and SCHROEDER, Circuit Judges.

SKOPIL, Circuit Judge:

This action is brought by the United States and the Pyramid Lake Paiute Tribe to quiet title to a water right to sustain the Pyramid Lake fishery. The question raised in this appeal is whether an equitable water adjudication filed by the government in 1913 and finalized in 1944 precludes this cause of action.

** Senior Circuit Judge, U. S. Court of Appeals, Fifth Circuit, sitting by designation.

In 1913 the United States filed in the U.S. District Court in Nevada an equitable action, *United States v. Orr Water Ditch Co., et al.*, Equity No. 3, naming as defendants virtually all water users on the Truckee River in Nevada. The government sought a decree quieting title to the water rights of all users of Truckee River water. As plaintiff, the government purported to represent two interests: the Newlands Reclamation Project, which required an appropriation of water for irrigation purposes; and the Pyramid Lake Indian Reservation, which was alleged to have a federally reserved water right. The proceedings terminated in 1944 with the filing of a final decree. The Reclamation Project's water right has enabled it to divert most of the flow of the Truckee River before it reaches Pyramid Lake. The Reservation's water rights were limited to a small quantity of irrigation water. The government did not assert a claim for water to sustain the Pyramid Lake fishery.

In 1973 the United States instituted this action on behalf of the Pyramid Lake Paiute Tribe. The complaint sought a decree quieting title to a reserved water right to fulfill the purposes of the Pyramid Lake Reservation, including the maintenance of the level of Pyramid Lake and the lower reaches of the Truckee River for fishery purposes. In 1974 the Tribe intervened as a party plaintiff, asserting the same right.

After an extensive trial, the district court held that the 1944 final decree in the *Orr Ditch* case precluded the cause of action asserted here. The district court dismissed the government's claim for a reserved water right for the Reservation for fishery purposes. The district court dismissed the Tribe's complaint in intervention in its entirety.

We affirm that portion of the district court's order giving preclusive effect to the *Orr Ditch* decree as to most of the defendants. We reverse that portion of the order dismissing the complaint as to the Truckee-Carson Irrigation District.

FACTS AND PROCEDURAL HISTORY

### 1. The Pyramid Lake Reservation

In 1844 John C. Fremont came across Pyramid Lake and the Indians inhabiting its shores. The Lake was "set like a gem in the mountains" and "broke upon [their] eyes like an ocean". It was about 50 miles long and 12 miles wide, considerably larger than its sister, Lake Tahoe. The Indians brought in fish to trade with the whites. The fish

> "were of extraordinary size—about as large as the Columbia River Salmon— generally from two to four feet in length ... they doubtless formed the subsistence of these people, who hold the fishery in exclusive possession .... "

The Expeditions of John Charles Fremont 609 (1970).

In 1859 the Secretary of the Interior directed that a 322,000 acre reservation be set aside, consisting of Pyramid Lake ("the Lake"), the lands surrounding it, and the lower reaches of the Truckee River, which feeds the Lake. In 1874 President Grant signed an executive order confirming the reservation. As the district court found, one of the purposes of establishing the reservation was to enable the Tribe to take advantage of the Pyramid Lake fishery, then consisting of a native species of cutthroat trout, and the cui-ui, which exist nowhere else. Under the supervision of the Department of Interior's Indian Service, the Indians began irrigating reservation land. By 1890, about 1,000 acres were irrigated. This had increased to 1,200 acres in 1913.

### 2. The Reclamation Project

In 1902 Congress passed the Reclamation Act, permitting the Secretary to withdraw from entry arid public lands and to initiate irrigation projects to reclaim them. Fifteen days after the Act was passed, the Secretary withdrew land for what became known as the Newlands Reclamation Project ("the Project") in western Nevada. The Project contemplated the irrigation of about 200,000 acres. It was designed to draw water from two rivers, the Carson and the Truckee, which originate in the Sierra Nevada Mountains. In its natural state, the Carson River, after reaching the Nevada desert, is lost in a vast sink. The Truckee runs from the Sierra Nevadas to Lake Tahoe, spills into eastern California, then into Nevada, and ends in Pyramid Lake. The Project would divert water from the Truckee River into the Lahontan Reservoir on the Carson River, which lies outside the Truckee River watershed. There the water would be stored for Project use. Many miles of irrigation works would transport the water to reclamation sites.

After land was withdrawn for the Project, the government posted notices claiming the right to all unappropriated water in the Truckee, and making a specific claim to the use of 1,500 cubic feet of water per second. Construction then began on Derby Dam, and on a large canal to divert water from the Truckee into the Lahontan Reservoir.

In 1904 Congress authorized the Secretary to include within the Project irrigable land located on the Pyramid Lake Reservation ("the Reservation"). A portion of that land was to be allotted to the Indians in 5-acre allotments. About 20,000 reservation acres were thought to be irrigable. Because there were relatively few Indians on the reservation, a large land surplus was anticipated. These surplus irrigable lands were to be sold to settlers, the proceeds to be used for the Indians' benefit.

### 3. The Orr Ditch Proceeding

Prior to the Project's initiation, a number of private landowners, land and water companies, and power generating companies had established rights in the Truckee. There were about 40,000 irrigated acres in the Reno Valley alone, owned by about 100 separate parties. Much of the water being diverted in the Reno Valley was being wastefully used, and there was "no practical way for the government to confine this very extensive up-river use within proper bounds." Further, the Pyramid Lake Reservation was believed to have a reserved water right with a very early priority date under the Winters doctrine. Winters v.

*United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), *aff'g,* 143 F. 740 (9th Cir. 1906). Only after water rights were adjudicated could the government know how much water it could divert. In times of scarcity the government could enforce restrictions on other users.

Nevada law offered a cheap and expeditious method for adjudicating water rights, under the auspices of the State Engineer. However, because the government expected to assert "difficult and intricate legal" theories, it was thought better to bring an equitable quiet title action in federal court. On August 21, 1912, the Attorney General authorized a suit to be initiated. The complaint in *United States v. Orr Water Ditch Co., et al.* was filed on March 3, 1913. The complaint asserted a claim to 10,000 cubic feet of water per second for the Project, and 500 cubic feet per second for the Reservation. The complaint sought to name as defendants all water users on the Truckee River in Nevada. It prayed for a decree quieting title to the rights of all parties.

With respect to the claim for the Reservation, the complaint was drafted broadly to permit the government to assert "the fullest sort of reserved rights for this reservation." John F. Truesdell, the Special Assistant U.S. Attorney who drafted the complaint, recognized that the Reservation rights were uncertain. At the very least, the Reservation was entitled to an appropriation right based on the Indians' historic use, even assuming the *Winters* reserved rights doctrine did not apply to executive order reservations. If a *Winters* right was available, its extent was uncertain. The reservation might be entitled to sufficient water for all irrigable Reservation acreage. Alternatively,

"[i]t might be held that the reservation of waters was limited to the fullest amount of water that could be used by the Indians for which the reservation was made and their reasonable increase, when living on allotments such as it has been the custom of the government to make . . . ."

Ex. U–10 at 8. The circumstances surrounding the establishment of the Reservation "would have an important bearing upon this question." Truesdell came to the conclusion that *Winters* rights ought to exist for executive order reservations, under the reasoning of *Conrad Investment Co. v. United States,* 161 F. 829 (9th Cir. 1908), *aff'g,* 156 F. 123 (C.C.D.Mont.1907). It was essential to include them in the adjudication: "[T]hese Indian reservation water rights are important and should be established to the fullest extent because they are senior and superior to most if not all the other rights on the river."

After filing the complaint, the government initiated extensive surveys of the land and ditches of all claimants. Much of this work was done by government agents, and some by engineers employed by the defendants. The parties shared the survey information. It was more than six years after the complaint was filed that the case reached an evidentiary hearing. During that time, the government's claims for the Reservation took shape. The 1904 Act (authorizing 5-acre Indian allotments, and sale of surplus irrigable land) was a dominant consideration. Two general categories of reservation lands were thought to be irrigable: about 19,000 acres of bench lands, and about 2,400 acres of "delta" or bottom lands lying along the Truckee. The 2,400 acres of bottom lands were already "to a very considerable extent being farmed by the Indians and they also embrace the agency and school property." Under the authority of the 1904 Act, the Reclamation Service planned to include in the Project the 19,000 acres of bench lands. Under the 1904 Act it was

"of course clear that each Indian belonging on the reservation is to have five acres of this land. It also seems clear that under the doctrine of the Winters case the original Indian withdrawn water right would attach to each of these five acres that the Indians are to have, but the rest of the 19,000 acres which will be irrigated by the works of the project will have to depend for their water right upon the general project water right."

Ex. U–88 at 2.

The claim was discussed with officials in the Indian Service. The government decid-

ed to press a claim for water sufficient to irrigate about 5,400 acres: 3,000 acres of bench lands (to account for 600 5-acre allotments) and 2,400 acres of delta lands. With minor changes, this was the claim asserted at the evidentiary hearing and in the government's post-hearing briefs.

Truesdell saw no conflict between the needs of the Reservation and the needs of the Project:

"[W]e have always had it in mind that there could be no conflict of interest between the Reclamation project and the Indian Reservation as to the irrigation of these 2,400 acres of delta lands, because these lands are the last on the river and we have thought that return flow from irrigation below the headgate of the single canal that serves all of the Reclamation Project lands would be ample to irrigate these Indian lands so that never would the Reclamation Project have to refrain from diverting water in order to satisfy the Indians' earlier priority."

Id. at 4.

The evidentiary hearing, conducted mainly by a Special Master, began in 1919 and lasted until 1921. Arguments were heard in September 1922. In July 1924, the Special Master issued his report and proposed decree. He agreed that there should be no conflict between the water needs of the Reservation's "meager" allotments and the needs of other users.

The Master recommended that a temporary restraining order be entered declaring the parties' water rights for a trial period. District Judge Farrington accepted the report and on February 13, 1926, signed a temporary restraining order. The order awarded the Reservation an 1859 priority date for water for 3,130 acres of delta or bottom lands. If 5-acre allotments of bench lands were made under the 1904 Act, the reservation would be entitled to additional water for those lands. For the Project, the government was to have a 1902 priority date for 1,500 cubic feet per second flow for the irrigation of 232,800 acres.[1]

On December 18, 1926, the government and the Truckee-Carson Irrigation District (TCID) signed a contract under which the latter was to operate the Project.

4.  *The Decline of the Fishery*

Pyramid Lake's fishery continued to be productive through the first part of the century. Around the time of the *Orr Ditch* evidentiary hearing, however, the Project's diversion of "almost the whole volume of the Truckee River" into another watershed, began to tell. The level of the Lake began to drop. This, in combination with refuse from upstream sawmills, built up a delta at the mouth of the Truckee. In 1921 Lorenzo Creel, a Special Supervisor in the Indian Service, had to arrange a special spill of water from Derby Dam to enable the Lake's trout to pass the delta. Without the additional water, the fish were unable to reach their upstream spawning grounds.

In 1922 Creel pronounced the fishery "doomed" unless an adequate flow of water could be assured. In January 1922, feeling that the fishery's needs had been overlooked, Creel suggested to the Commissioner of Indian Affairs and to Reno Agency officials that water for the fishery could be sought in the *Orr Ditch* case:

"I have accumulated a great deal of material for this report, and in studying over the situation it is clear that the intent of the government, when the Pyramid Lake reservation was established, was to include Pyramid Lake for the use and benefit of the Paiute Indians. The only benefit to be derived therefrom apparently is the Pyramid Lake trout.

"Now, if this view be the correct one, have not the Indians a prior right to sufficient water from the Truckee River to enable those trout to reach their natural spawning beds, in order that they may reproduce themselves? This question is so vital that I wish to recommend that it be taken up at once; and probably Mr.

---

1.  It was recognized, notwithstanding this priority, that there would be insufficient water to irrigate the Project's entire 232,800 acres. In

fact, there has never been irrigated more than about 65,000 acres of land in the Project.

Truesdell and Mr. Withers, who are defending the right of the Indians to water for irrigation purposes, may so amend their brief on behalf of the Indians that this additional water right may be claimed for them, and thus save a separate action, with more prompt results."

Ex. U–101 at 3.

If the Project's requirements were deemed "paramount to the value of the lake to the Indians", Creel suggested that the Indians should be awarded compensation. Supervisor Wilson, in charge of the Indian Service's Reno Agency, echoed Creel's suggestion in correspondence to the Acting Commissioner of Indian Affairs. The Acting Commissioner responded that his office was

"disposed to do everything it can to protect the fish, not only for the benefit of the Indians, but of the white population as well, so far as consistent with the larger interests involved in the proposition, having to do with the reclamation of thousands of acres of arid and now useless land for the benefit of the country as a whole."

Ex. U–113 at 2–3.

Members of the Tribe and others continued to point out the need for water for the fishery. The government's responses varied. In January 1925 a delegation of tribal members met with the Indian Service Agency Supervisor in Reno. The Supervisor sent a copy of minutes of the meeting to the Commissioner of Indian Affairs. A response came from the Commissioner of Reclamation, saying that his Bureau would "carefully guard against taking any action which would impair the right of the Indians" to water for fishing. In the same year, Representative Raker of California wrote to the Attorney General asking about the status of the *Orr Ditch* case. The Assistant Attorney General in turn wrote Ethelbert Ward, the attorney then handling the case, stating his understanding that the fishing rights of the Indians were not involved in the *Orr Ditch* litigation, but asking confirmation.

"[Congressman Raker] seems particularly interested in that aspect of the suit connected with the Pyramid Lake Indian Reservation and the rights of the Indians, and also in the preservation of the Truckee River as a fishing stream. Apparently some action is contemplated looking to legislation requiring installation of means for facilitating the passing of fish over the dams, etc. He inquired especially whether the adjudication suit involved any questions, or has brought out any information, concerning the fishing rights of the Indians. I assume, of course, that nothing of the kind is involved, but would like a direct statement from you concerning it."

Ex. U–23. Ward replied:

"You will see from the bill of complaint that nothing is said about fish or water to be used for fish passing up and down the stream. Nothing appeared about this subject in any pleadings, nor was any testimony taken or any suggestions made from the beginning of the case down to the present time regarding fish.

"Inasmuch as the Government has control of the Derby Dam, I have always thought that the Reclamation Service and the Indian Service, both bureaus of the Department of the Interior, could settle the matter between them as to providing the proper fishways and the comparatively small amount of water which may be needed to enable the fish to pass up the fishways."

Ex. U–24. Congressman Richards of Nevada also wrote to the Commissioner of Indian Affairs. Commissioner Burke responded:

"We fully realize the value and importance of the fish, not only to the Indians but also to the people of that section of the country generally and will do everything that is possible for the preservation of this industry so far as is in our jurisdiction and within the limitation imposed by available funds."

Ex. U–152. In 1926 the Commissioner of Indian Affairs advised the Indians to resign themselves to the loss of water for the fishery, which would "be used practically as far as it can be for irrigation."

A severe drought (1929–34), combined with the Project's diversions, and other factors, pushed the fishery further toward extinction. In a 1935 letter to the Commissioner of Indian Affairs, Reno Agency Indian Service officials described the

> "tragic situation which results from the drying up of the Truckee River through diversion of practically all of its water for irrigation purposes. You have assured us and our own understanding of the situation persuades us against our will that it will be practically impossible at this late date to obtain any assured flow of water from the Truckee River into the Lake. The time for that was when the original Truckee River water rights were being adjudicated."

Ex. A–506.

Between 1920 and 1938, the level of the Lake dropped some 40 feet; its surface area was reduced by about 20,000 acres. By the early 1940's the strain of cut-throat trout indigenous to the Lake was extinct. The cui-ui just survived. Beginning in 1941 efforts began to restore the fishery with a dam and fishway. In the later 1940's Nevada began stocking the Lake. The success of this effort led to the enactment in 1956 of the Washoe Project Act. Section 4 of that Act declared that "restoration of the Pyramid Lake trout fishery to its full potential value is deemed to be of national interest and importance". Several Lahontan cut-throat trout hatcheries now augment the Lake's fishery. A small, experimental cui-ui hatchery is operating on the Reservation. In 1976 the Marble Bluff Dam and Fishway were completed, enabling the fish to bypass the delta in transit to their spawning grounds. Releases from Stampede Reservoir, completed in 1970, have helped provide flows needed for the fishway. See *Pyramid Lake Tribe v. Morton*, 354 F.Supp. 252 (D.D. C.1973).

As the district court in the instant case observed, these restoration efforts "appear to justify optimism for eventual success." Nevertheless, the level of the lake has continued to drop since 1940. The cui-ui is classified under federal law as an "endangered species", the Lahontan cut-throat as a "threatened species", under 15 C.F.R. § 17.-11 at 87–88 (1977).

5. *The Truckee River Agreement and the Final Orr Ditch Decree*

In the mid-1930's the principal organizational defendants in the *Orr Ditch* case (Washoe County Water Conservation District, and the Sierra Pacific Power Co.) and TCID, proposed an agreement among all parties. The proposed agreement conformed to the temporary *Orr Ditch* decree. The parties proposed to stipulate to a final decree, contingent on the construction of additional upstream storage at Boca Reservoir.

Ethelbert Ward raised an objection. The temporary decree assumed that only about 3,000 acres of the 19,000 acres of irrigable reservation bench lands would be in Indian ownership. This was based on the assumption that the 1904 Act, authorizing 5-acre Indian allotments and sale of the surplus, would be carried out. On May 9, 1934 Ward noted that Congress was considering the Wheeler-Howard Bill, which would prohibit further allotments. The Pyramid Lake Reservation lands had never been allotted, and it now appeared they never would be. Accordingly, Ward suggested that the government seek a reserved right for all 19,000 acres of irrigable Reservation bench lands. The Bureau of Indian Affairs looked into this possibility but rejected it because of its "doubtful feasibility from all standpoints, including that of water supply ...." Several other features of the proposed agreement were debated within the Interior Department. The Department negotiated an increased duty of water for acreage included in the Reservation claims. The Reservation's claim was limited to 3,130 acres of bottom land and 2,745 acres of bench land. The agreement was signed on July 1, 1935. A stipulation for entry of a final decree was executed one and one-half years later. In April 1942, after completion of Boca Reservoir, the *Orr Ditch* decree was filed. In September 1944, hearings on entry of the final decree were held. The

decree was entered on September 8, 1944. No appeal was filed. Since it was entered, the decree has been enforced only twice: in 1949 and in 1969.

## 6. *Proceedings Following the Orr Ditch Case*

In 1951, pursuant to the Indian Claims Commission Act, 25 U.S.C. § 70 *et seq.*, the Tribe sued the government for damage to the fishery. In 1973 the Commission found the government liable. *Northern Paiute Tribe v. United States*, 30 Ind.Cl.Comm. 210 (1973). In 1975 the Claims Commission approved a compromise settlement of $8,000,-000 in the Tribe's favor "on its claim for damages suffered as the result of its not having received all of the water to which it was entitled under rights reserved for the Pyramid Lake Indian Reservation". *Pyramid Lake Paiute Tribe v. United States*, 36 Ind.Cl.Comm. 256 (1975). The parties stipulated their belief that the Tribe's water rights themselves were undiminished, and the award of damages did not represent compensation for "the loss, diminution, or taking of any water rights." *Id.* at 259–60.

This action was filed by the government on December 21, 1973. The complaint purported not to "dispute the rights decreed" in the *Orr Ditch* action but only to secure "additional rights" for the United States and the Tribe, with priority dates superior to those of the defendants. The government named as defendants not only those whose rights stemmed from the *Orr Ditch* decree but also those whose rights to Truckee River water originated elsewhere. The State of Nevada was named as a defendant in its proprietary capacity, in its governmental capacity as the issuer of permits to appropriate unappropriated waters, and as *parens patriae* for its citizens.

The complaint alleged a reserved water right for the Reservation for fishery purposes, with an 1859 priority date. The government also sought water for the Stillwater Wildlife Refuge, designated in 1948; the Toiyabe National Forest, set aside in 1905, 1909, and 1926; and other purposes.

Many of the 17,000 defendants raised, as an affirmative defense, the preclusive effect of the *Orr Ditch* decree. The plaintiffs sought to avoid preclusion on equitable grounds and on the ground that in the *Orr Ditch* case the government plaintiff had an impermissible conflict of interest. The plaintiffs maintained that precluding litigation of the Reservation's fishery water right would deprive the Tribe of due process of law. In February 1975 the district court bifurcated the trial to consider the res judicata issue separately from all other issues. The trial on this issue commenced on November 17, 1975 and continued intermittently through May 20, 1976. Briefs were submitted and final argument heard in October 1977. The district court held that the *Orr Ditch* decree was res judicata and dismissed the government's claim to the reserved water right for the Reservation for fishery purposes. The district court dismissed the Tribe's complaint in intervention in its entirety.

The district court held that the cause of action asserted here was part of the same cause of action asserted in *Orr Ditch*. The plaintiffs were both held to be in privity with the plaintiff in *Orr Ditch* and all defendants here in privity with the *Orr Ditch* defendants. As to the government's conflict of interest in *Orr Ditch*, the court found as follows:

"That by the enactment of the Reclamation Acts of 1902 and 1904, which declared a national policy of reclamation of the arid lands of the West, and the implementation thereof by the Department of the Interior by the construction and establishment of the Newlands Reclamation Project, there was a foreseeable conflict of purposes created by the Congress within the Interior Department and as between the Bureau of Reclamation on the one hand in asserting large water rights for its reclamation projects and the Bureau of Indian Affairs on the other in the performance of its obligations to protect the rights and interests of the Indians on the Pyramid Lake Paiute Indian Reservation. That this conflict of purposes was apparent prior to and during the *Orr*

*Ditch* proceedings and was resolved within the executive department of government by top-level executive officers acting within the scope of their Congressionally-delegated duties and authority and were political and policy decisions of those officials charged with that responsibility, which decisions resulted in the extinguishment of the alleged fishery purposes water right.

"The government lawyers in *Orr Ditch*, both departmental, agency and bureaus, as well as those charged with the responsibility for the actual conduct of the litigation, are not chargeable with an impermissible conflict of purpose or interest in carrying out the decisions and directions of their superiors in the executive department of government and the Tribe has not suffered any deprivation or denial of due process of law by reason thereof which may be asserted or applied in this case to diminish or defeat the rights of the defendants acquired by the adjudication and the final decree in *Orr Ditch*. The good faith or motives of said government counsel is not questioned by plaintiff and the Tribe in this proceeding."[2]

The court also found that since 1944, Congress, the executive branch, and the courts have recognized the government's actions in *Orr Ditch*, confirmed them, and "recompensed the Tribe" for any loss.

The plaintiffs contended below that a water right for fishery purposes could be implemented in such a way that any harm to the defendants would be small. The district court held that it was the plaintiffs' burden to prove this contention, and that the burden was not met.

## ISSUES

The issues presented by this appeal fall into four general categories:

I. Those issues relating to the government's authority in bringing the *Orr Ditch* suit:

A. Did Congress authorize the Secretary of the Interior to extinguish the Reservation water rights? Under this heading we discuss the Reclamation Act of 1902 and the 1904 Appropriations Act.

B. Did Congress authorize the Secretary to seek a judicial decree quantifying federally-reserved water rights?

II. Those issues relating to the specific elements of the res judicata defense:

A. Is the cause of action asserted here part of the same cause of action asserted in *Orr Ditch*?

B. What parties may rely on the *Orr Ditch* decree?

1. Orr Ditch defendants.

2. Truckee-Carson Irrigation District.

III. Congressional actions since 1944 said to ratify the *Orr Ditch* decree.

IV. Finally, we discuss briefly several arguments which the trial court either rejected or did not consider controlling.

We apply the "clearly erroneous" standard to the district court's findings of fact. However, in several instances, conclusions listed by the district court as "findings of fact" include legal conclusions. This is true of the district court's findings concerning the nature of the government's conflict (quoted at 1295–1296 *supra*). We are not bound by the legal conclusions or the mixed findings of law and fact. *See Bogardus v. Commissioner*, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32 (1937); *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106 (9th Cir. 1976); *Official Creditors Comm'n v. Ely*, 337 F.2d 461, 467 (9th Cir. 1964), *cert. denied*, 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965); *Weible v. United States*, 244 F.2d 158 (9th Cir. 1957); *FTC v. Texaco, Inc.*, 555 F.2d 862, 876 n. 29 (D.C. Cir.1977), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); *Cordovan Assoc. v. Dayton Rubber Co.*, 290 F.2d 858, 861 (6th Cir. 1961). Accordingly, we have independently reviewed the evidence to assess these findings.

2. We note that the district court did not find that executive officials intentionally extinguished the fishery claim but only that their decisions resulted in extinguishment.

## DISCUSSION

### I. Authority for the *Orr Ditch* Proceedings.

#### A. Did Congress authorize the Secretary of the Interior to extinguish the Reservation water rights?

The district court found that the 1902 Reclamation Act, which provided general authority for reclamation projects and the 1904 Appropriations Act, which provided specific authority to reclaim and dispose of Pyramid Lake Reservation lands, demonstrated Congress's intent to subordinate the Tribe's property to reclamation projects. It relied heavily on a 1915 Supreme Court decision, *Henkel v. United States*, 237 U.S. 43, 35 S.Ct. 536, 59 L.Ed. 831 (1915), for its interpretation of the Reclamation Act. We first address the authority conferred by the 1902 Reclamation Act.

#### 1. The Reclamation Act of 1902.

The Reclamation Act of 1902 confers on the Secretary broad condemnation authority.[3] The district court found that this impliedly authorized the Secretary to acquire any property needed for reclamation projects, whether the owner of the property was an Indian tribe or a private owner. The court held that the Reclamation Act created a conflict between the need to develop reclamation projects and the responsibility to protect Indian property. By directing the Secretary to develop reclamation projects, and authorizing him to use the condemnation power, Congress authorized the Secretary to use the broadest possible discretion in acquiring property. This necessarily included the power to extinguish Indian water rights. The trial court found the Secretary did this in the course of the *Orr Ditch* litigation. We reject this analysis.

The Reclamation Act in itself conferred no water rights. It provided means for acquiring water rights, but only under state law. It is now settled that except when inconsistent with "clear congressional directives" respecting a reclamation project, section 8 of the Reclamation Act requires the Secretary to comply with state law in acquiring water rights. *California v. United States*, 438 U.S. 645, 665–66, 671 n. 24, 98 S.Ct. 2985, 2996, 2999 n. 24, 57 L.Ed.2d 1018 (1978).[4]

---

**3.** Relevant sections of the Reclamation Act are as follows:

"Sec. 7. That where, in carrying out the provisions of this act, it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby authorized to acquire the same for the United States by purchase or by condemnation under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose, and it shall be the duty of the Attorney-General of the United States upon every application of the Secretary of the Interior, under this act, to cause proceedings to be commenced for condemnation within thirty days from the receipt of the application at the Department of Justice.

"Sec. 8. That nothing in this act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in the irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropria-

tor, or user of water in, to, or from any interstate stream or the waters thereof: PROVIDED, That the right to the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated and beneficial use shall be the basis, the measure, and the limit of the right.

\* \* \* \* \* \*

"Sec. 10. That the Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect."

Act of June 17, 1902, 32 Stat. 389, codified at 43 U.S.C. §§ 421, 383.

**4.** We find no merit to defendant Nevada's suggestion that *California v. United States, supra,* announces a new principle of law that should not be given retroactive effect. *See Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 291, 78 S.Ct. 1174, 1183, 2 L.Ed.2d 1313 (1958).

The defendant's authorities tend to establish the paramount authority conferred by the Reclamation Act to acquire property needed for reclamation projects. However, those cases concern acquisitions of non-federal property. *United States v. Buffalo Pitts Co.*, 234 U.S. 228,

■ Nor does the Reclamation Act confer authority to acquire additional water for a reclamation project by extinguishing federal water rights reserved for other purposes. "[T]he Secretary of the Interior could not take any action in appropriating the waters of the state streams 'which could not be undertaken by an individual or corporation if it were in the position of the Government as regards the ownership of its lands.'" *California v. United States, supra,* 438 U.S. at 665, 98 S.Ct. at 2996 (quoting from HR Rep.No. 794, 57th Cong., 1st Sess. 7–8 (1902)). Federal reserved rights cannot be acquired or extinguished under state water laws. *FPC v. Oregon,* 349 U.S. 435, 444, 75 S.Ct. 832, 838, 99 L.Ed. 1215 (1955); *United States v. Cappaert,* 508 F.2d 313, 320 (9th Cir. 1974), *aff'd,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976); *and see Minnesota v. United States,* 305 U.S. 382, 386–87, 59 S.Ct. 292, 294, 83 L.Ed. 235 (1939). Accordingly, federally reserved water rights, such as those appurtenant to the Pyramid Lake reservation, could not be acquired under the Reclamation Act.

This conclusion is also backed by sound policy. Under the *Winters* doctrine, when the federal government reserves land for federal purposes, it impliedly reserves sufficient water to serve those purposes. We cannot suppose that reservations made for non-reclamation purposes were impliedly supplanted by the reclamation program. We do not say that Congress cannot abolish federal reservations, but we must hesitate to infer this, absent the clearest legislative directive.

■ This consideration applies *a fortiori* when Indian water rights are involved. An intent to extinguish Indian property rights is "not to be lightly imputed to Congress." *Menominee Tribe v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). Such a drastic result requires "a clear expression of congressional intent." *United States v. Winnebago Tribe,* 542 F.2d 1002, 1005 (8th Cir. 1976). Executive order reservations such as the Pyramid Lake reservation merit "the same protection as the Indian title to reservations created by treaty or statute." *United States v. Southern Pacific Transportation Co.,* 543 F.2d 676, 686 (9th Cir. 1976). Ambiguities in statutes are resolved in favor of the Indians. *United States v. Santa Fe Pacific R.R.,* 314 U.S 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941). Thus, a general statute, such as the Reclamation Act, is not interpreted to authorize the extinguishment of Indian property, absent a clear showing of congressional intent. *Leavenworth, Lawrence, & Galveston R.R. v. United States,* 92 U.S. 733, 742, 23 L.Ed. 634 (1876); *McCandless v. United States,* 25 F.2d 71 (3d Cir. 1928); *Confederated Tribes v. Alexander,* 440 F.Supp. 553 (D.Or.1977).[5]

■ Accordingly, we reject the defendants' suggestion that the Reclamation Act of 1902 conferred on the Secretary authority to extinguish the Pyramid Lake Tribe's water rights. Much less can we agree that the Act conferred authority to proceed to extinguish these rights in the "backhanded" manner suggested by the defendants. *Menominee Tribe v. United States, supra,* 391 U.S. at 412, 88 S.Ct. at 1710–1711. Even where the Secretary has acquired existing water rights under state law, he has typically provided some notice to the affected owner. *E. g., Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *United States v. Gerlach Live Stock Co.,* 339 U.S.

---

34 S.Ct. 840, 58 L.Ed. 1290 (1914); *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); *City of Fresno v. California,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963); *Turner v. Kings River Conservation Dist.,* 360 F.2d 184 (9th Cir. 1966) (Flood Control Act of 1944); *United States v. Carmack,* 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946) (Public Buildings Act).

**5.** *FPC v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), is not to the contrary. The land at issue there was held by Indians in fee and not by the government in trust. The broad condemnation authority conferred by the Federal Power Act, involved in *Tuscarora,* could be interpreted to apply to fee lands as well as any other non-trust lands. Here we are concerned with trust property, the title to which is held by the U.S. *See United States v. Winnebago Tribe, supra,* 542 F.2d at 1005; Getches, Rosenfelt, and Wilkinson, *Federal Indian Law* 201, 203 (1979).

725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950). We must assume that if Congress had intended to confer authority to extinguish Indian property rights, it would have provided for a more straightforward procedure. *See Waters and Water Rights, supra,* at 162 n.20.

The district court relied on *Henkel v. U. S., supra,* 237 U.S. 43, 35 S.Ct. 536, 59 L.Ed. 831, for its interpretation of the authority conferred by the 1902 Reclamation Act. *Henkel* held that the broad authority conferred by section 7 of the Reclamation Act was intended to permit acquisition by purchase of Indian lands. The action sanctioned in *Henkel* was of an entirely different character than the action involved here. In *Henkel* the Indians involved received cash compensation, and were permitted to select other allotments in lieu of those taken. In short, *Henkel* involved a purchase, specifically authorized by section 7 of the Reclamation Act. Here, in contrast, the Secretary has never declared an intention to purchase, extinguish, or acquire the Tribe's water rights. No compensation was paid or even offered. Indeed, the government takes the position that acquisition was

never intended. *Henkel's* broad dicta can have little independent force in this setting.

**2. The 1904 Appropriations Act.**

█ The district court held that section 26 of the 1904 Appropriations Act[6] specifically authorized the Secretary to commit portions of the Tribe's land to the Newlands project. We agree with this interpretation of section 26. We do not agree that section 26 authorized the Secretary to extinguish the Tribe's water rights in the *Orr Ditch* proceedings.

Section 26 was never implemented. No 5-acre allotments were ever made to Indians. No surplus land was disposed of. No Indian lands received irrigation water from the Newlands project. Even assuming that disposal of surplus reservation land would have reduced the Tribe's reserved water rights,[7] disposal under section 26 never occurred.[8] In these circumstances section 26 can have no effect on the Tribe's water rights.

Defendant City of Reno suggests alternatively that section 26 had a broader purpose than reclamation: it was intended to compel members of the Tribe to become farm-

---

**6.** Section 26 of the 1904 Act provides:

"That in carrying out any irrigation enterprise which may be undertaken under the provisions of the Reclamation Act of June seventeenth, nineteen hundred and two, and which may make possible and provide for, in connection with the reclamation of other lands, the reclamation of all or any portion of the irrigable lands on the Pyramid Lake Indian Reservation, Nevada, the Secretary of the Interior is hereby authorized to reclaim, utilize, and dispose of any lands in said reservation which may be irrigable by such works in like manner as though the same were a part of the public domain: PROVIDED, That there shall be reserved for and allotted to each of the Indians belonging on the said reservation five acres of the irrigable lands. The remainder of the lands irrigable in said reservation shall be disposed of to settlers under the provisions of the Reclamation Act: PROVIDED, FURTHER, That there shall be added to the charges required to be paid under said Act by settlers upon the unallotted Indian lands such sum per acre as in the opinion of the Secretary of the Interior shall fairly represent the value of the unallotted lands in said reservation before reclamation, said sum to be paid in annual installments in the same manner as the charges under the Reclama-

tion Act. Such additional sum per acre, when paid, shall be used to pay into the reclamation fund the charges for the reclamation of the said allotted lands, and the remainder thereof shall be placed to the credit of said Indians and shall be expended from time to time, under the direction of the Secretary of the Interior, for their benefit."
33 Stat. 189, 225 (1903–1905).

**7.** *E. g.,* under the irrigable acreage approach to quantifying reserved water rights, *see Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), a reduction in irrigable reservation land would imply a reduction in the quantity of the reserved water right.

**8.** In 1904 the allotment policy dominated federal-Indian affairs. *See generally,* F. Cohen, *Handbook of Federal Indian Law* 217, *et seq.* (1942). In 1934 the Indian Reorganization Act, 48 Stat. 984, 25 U.S.C. § 461 et seq., withdrew authority for further allotments. *See Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 479, 96 S.Ct. 1634, 1644, 48 L.Ed.2d 96 (1976); *Mattz v. Arnett,* 412 U.S. 481, 496 n.18, 93 S.Ct. 2245, 2254, n.18, 37 L.Ed.2d 92 (1973).

ers, by extinguishing the Tribe's fishery. We do not doubt that such a step might have been consistent with the mood of the times. *See, e. g., Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Nor do we doubt that Congress had the power to take such a step. *See Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). However, we have not been directed to any legislative history of the 1904 Act showing an intent to extinguish the fishery, and we find no such indication in the text of the Act.[9] We must therefore reject the City's suggestion.

The City also contends that section 26 was in effect implemented in the *Orr Ditch* proceedings. We see no merit in this argument. There is no evidence that in the course of the *Orr Ditch* proceedings, government officials even purported to allot tribal lands and distribute the surplus. Without taking these steps, there could be no reduction of the Tribe's water rights under section 26 of the 1904 Act. Nor was there any attempt to provide compensation to the Tribe for taking surplus lands, which section 26 clearly required.[10]

B. Was the Secretary Authorized to Obtain a Judicial Decree Quantifying Reserved Water Rights?

■ Section 10 of the Reclamation Act of 1902 authorized the Secretary "to perform any and all acts ... as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect." It is reasonable to conclude that an action to quantify reserved water rights was within the authority conferred by section 10 of the Reclamation Act of 1902. This authority, with the government's guardianship interest in Indian trust land, necessarily implied some authority to represent Reservation interests in litigation. *See Heckman v. United States,* 224 U.S. 413, 437–39, 32 S.Ct. 424, 431–432, 56 L.Ed. 820 (1912) (suit to cancel conveyance of restricted Indian land); *United States v. Rickert,* 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903) (action to enjoin unauthorized taxation of Indian property); *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923); *United States v. Ahtanum Irrigation District,* 236 F.2d 321 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957) (suit to establish Indian water right).

The authority to represent the Tribe in litigation must be distinguished from the authority to extinguish tribal property interests. The Secretary's policy decisions regarding the conduct of the *Orr Ditch* litigation could not, in themselves, extinguish the Tribe's property interests. To the extent extinguishment occurs, it is the result of

---

**9.** Compare the history of the neighboring Walker River Indian Reservation, which was established by the same document and confirmed by a nearly identical executive order as established the Pyramid Lake Reservation. Both reservations included lakes with fisheries and the lower reaches of rivers feeding the lakes. The statute authorizing the allotment of the Walker River Reservation provided for 20 acre allotments and, with the consent of a majority of the Tribe, the relinquishment of the rest of the reservation. 32 Stat. 245, 260. Pursuant to this statute most of the Walker River Reservation, including Walker Lake, was ceded to the government. *United States v. Southern Pac. Transp. Co., supra,* 543 F.2d at 693–96. If Congress intended to extinguish the Tribe's fishery, we must assume that the allotment process, demonstrated on the Walker River Reservation, was the means Congress chose.

**10.** The district court did not rest its holding directly on 25 U.S.C. §§ 2 and 9. However, the defendants urge that two cases interpreting those sections, *United States v. Ahtanum Irr. Dist.,* 236 F.2d 321 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957) (*Ahtanum I*), and 330 F.2d 897 (9th Cir. 1964), *cert. denied,* 381 U.S. 924, 85 S.Ct. 1558, 14 L.Ed.2d 683 (1965) (*Ahtanum II*), provide alternative authority for the Secretary to extinguish Indian waters.

Even if we agreed that the *Ahtanum* cases could be extended by analogy to this case, those cases have been modified by *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), which was decided after *Ahtanum I* and before *Ahtanum II.* Under *Kake,* agreements between the government and non-Indians to alienate Indian property can only be valid if they are needed "to implement specific laws" other than 25 U.S.C. §§ 2 and 9. To be valid, then, the Secretary's conduct in *Orr Ditch* must find its basic authority elsewhere.

giving the *Orr Ditch* decree preclusive effect, which could not be determined either by administrative officials or by the court rendering the decree. *Taunton Gardens Co. v. Hills*, 557 F.2d 877 (1st Cir. 1977); *Gonzales v. Cassidy*, 474 F.2d 67, 74 (5th Cir. 1973); Restatement of Judgments, § 86, Comment h (1942). *See also* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments to the Federal Rules of Civil Procedure*, 81 Harv.L.Rev. 356, 393 (1967).

■ Authority to represent the Reservation in litigation does not give the government completely unrestricted control over the litigation. The government acts as a trustee, which implies obligations which may supplement the obligations of an advocate. *See, e. g.*, Restatement (Second) of Trusts §§ 170 & Comments p, q, r (1959). It is therefore appropriate for courts to be concerned with the adequacy of the government's representation of its Indian wards, and to grant tribes leave to intervene where proper. *See, e. g., New Mexico v. Aamodt*, 537 F.2d 1102, 1106 (10th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *Manygoats v. Kleppe*, 558 F.2d 556 (10th Cir. 1977).

Once litigation is concluded, a court's focus must shift. A collateral attack on a final judgment implicates a range of interests. We must be concerned with the adequacy of representation afforded the Reservation. We must also protect adverse parties who have reasonably relied on the government's authority in the litigation. Principles of res judicata are designed to take these divergent interests into account. Accordingly, we turn to consider the requirements of res judicata rules.

## II. Res Judicata.

We next address the question whether, under traditional principles of res judicata, the *Orr Ditch* litigation can preclude litigation of the cause of action asserted here. We first decide whether this cause of action is part of the *Orr Ditch* cause of action. We then consider what parties may take advantage of the *Orr Ditch* decree.

### A. Is This Cause of Action Part of the Cause of Action Asserted in *Orr Ditch*?

The Tribe contends that the cause of action the government asserted in *Orr Ditch* is not the same cause of action asserted here. It makes three arguments: First, it points out that different evidence would be required to sustain a fishery water right and an irrigation right. Second, it suggests that in *Orr Ditch* the government intended to assert only a cause of action for irrigation water, not for water for all Reservation purposes. Third, it maintains that in equitable water adjudications, only claims that are actually litigated merge into the final decree. We will address these arguments in order.

■ The Tribe asserts that different evidence would be required to establish a fishery water right than to establish an irrigation water right. *See United States v. The Haytian Republic*, 154 U.S. 118, 125, 14 S.Ct. 992, 994, 38 L.Ed. 930 (1894); *Bankers Trust Co. v. Pacific Employers Insurance Co.*, 282 F.2d 106 (9th Cir. 1960), *cert. denied*, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961); Restatement of Judgments, *supra* § 61. We find this analysis unpersuasive. The basis for either kind of reserved right would be the same: the executive actions by which the Reservation was established, and the intent that motivated those actions. *See United States v. Walker River Irrigation District*, 104 F.2d 334 (9th Cir. 1939). The priority date depended on the same evidence. The water rights are appurtenant to the same reservation, and relate to the same source of water. Though a determination of quantity would depend on different evidence, this by itself is insufficient to distinguish this cause of action from the *Orr Ditch* cause of action. The "same evidence" test is but one of many tests used to distinguish one cause of action from another. *See* 1B *Moore's Federal Practice* ¶ 0.410[1], at 1157–58 (2d ed. 1980); Restatement (Second) of Judgments § 61 (Tent. Draft No. 1, 1973). We find it undeterminative in this case.

This issue is determined by the district court's findings of fact regarding the intent of the government in bringing the *Orr Ditch* case. The district court found "[t]hat *Orr Ditch* was intended by all concerned, lawyers, litigants and judges, as a general all inclusive water adjudication suit which sought to adjudicate all rights and claims" to the waters of the Truckee. This finding is not clearly erroneous. The complaint was drafted in comprehensive terms, and was certainly adequate to assert all of the government's water rights claims. The purpose of the proceeding was to obtain a decree upon which all parties could rely. This purpose would have been defeated if the government's action did not include important claims that could upset the decreed rights of the parties.

In *Orr Ditch* the government might have sought an adjudication for certain water uses. *See Hudson v. West*, 47 Cal.2d 823, 306 P.2d 807, 811 (1957). It might have sought a decree leaving open the possibility of expanding the Tribe's water right, as in *Conrad Investment Co. v. United States, supra*, 161 F. 829. It chose, instead, a comprehensive adjudication. *See United States v. Walker River Irrigation District, supra*, 104 F.2d 334. Accordingly, we reject the Tribe's suggestion that the *Orr Ditch* cause of action was intended to be less than comprehensive.

The Tribe asserts that in equitable water adjudications only claims actually litigated are barred from relitigation. In effect, this rule would abolish the broader res judicata doctrine of claim preclusion in water adjudications, leaving only the doctrine of collateral estoppel or issue preclusion, to prevent relitigation.[11] We cannot accept this position in its full sweep. We are bound by the district court's finding that the government placed in issue the full Reservation cause of action. Between parties with adverse claims, causes of action properly placed in issue may merge in an equity decree. *Union Mill & Mining Co. v. Dangberg*, 81 F. 73 (C.C.D.Nev.1897); 3 *Kinney on Irrigation and Water Rights* § 1536, at 2766 (1912). We therefore reject the Tribe's suggestion that the *Orr Ditch* decree could bar relitigation of only those claims actually litigated.

**B. Parties**

**1. The *Orr Ditch* Defendants.**

The Tribe contends that it was improperly and inadequately represented in the *Orr Ditch* case and cannot be bound by the judgment, consistent with due process. The *Orr Ditch* defendants insist that due process offers the Tribe no protection in this setting. They also assert that they had no knowledge of any impropriety in the government's representation in *Orr Ditch*, and so are entitled to rely on the decree. We address the defendants' arguments in order.

Generally, preclusion extends no further than to the parties of the prior litigation. *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940). This rule stems from our society's concern for individual rights as expressed in the due process clauses of the fifth and fourteenth amendments. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) (dictum); *Postal Telegraph Cable Co. v. City of Newport*, 247, U.S. 464, 476, 38 S.Ct. 566, 570–571, 62 L.Ed. 1215 (1918); 1B *Moore's Federal Practice, supra*, ¶ 0.411[1], at 1252; F. James & G. Hazard, *Civil Procedure* § 11.22 (2d ed. 1977). Thus, "judicial action enforcing [the prior judgment] against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments require." *Hansberry v. Lee, supra*, 311 U.S. at 41, 61 S.Ct. at 118. Al-

---

11. Under the doctrine of res judicata (or "claim preclusion") a judgment on the merits in a prior action involving the same parties or their privies bars a second action based on the same cause of action. The bar applies not only to matters that were actually litigated but also to all claims that might have been litigated. In contrast, collateral estoppel (or "issue preclusion") precludes a second litigation only of issues that were actually litigated. *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 867–868, 99 L.Ed. 1122 (1955).

though these authorities deal with personal judgments their reasoning on procedural due process applies to quiet title judgments. *See O'Boyle v. Bevil*, 259 F.2d 506, 513 (5th Cir. 1958), *cert. denied*, 359 U.S. 913, 79 S.Ct. 590, 3 L.Ed.2d 576 (1959) (citing *Hansberry v. Lee, supra*).

This general rule is subject to an exception for persons in privity with parties. *See* 1B *Moore's Federal Practice, supra,* ¶ 0.411[1]. Privity "denotes a legal conclusion rather than a judgmental process." *Southwest Airlines Co. v. Texas International Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). It simply represents a conclusion that a person is so closely connected to a party that with respect to the issues in litigation the person's interests are essentially the same as those litigated interests of the party. *Jefferson School of Social Science v. Subversive Activities Control Board*, 331 F.2d 76, 83 (D.C. Cir. 1963). A finding of privity, then, reflects a belief that the relation between the party and non-party is so close that the judgment may fairly bind the non-party. F. James & G. Hazard, *supra*, at 576. If the relationship is not sufficiently close, privity is lacking and preclusion in that case would necessarily deny due process to the non-party.

Privity and fairness exist if a party represented the interests of the non-party, such as a guardian or fiduciary might represent a ward or beneficiary. The case law clearly supports this principle, *see, e. g., Kersh Lake Drainage District v. Johnson*, 309 U.S. 485, 491, 60 S.Ct. 640, 644, 84 L.Ed. 881 (1940) (decree binds bondholders represented by indenture trustee under bond issue); *Heckman v. United States, supra*, 224 U.S. at 445–46, 32 S.Ct. at 434–435 (decree will bind Indians represented by United States); *Kerrison v. Stewart*, 93 U.S. 155, 160, 23 L.Ed. 843 (1876) (decree binds beneficiaries represented by trustee), and the rule appears in the Restatement (Second) of Judgments.

"A person who is not a party to an action but who is represented by a party is bound by . . . the rules of res judicata as though he were a party. A person is represented by a party who is:

"(a) The trustee of an estate or interest of which the person is a beneficiary; or . . .

"(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or

"(d) An official or agency invested by law with authority to represent the person's interests; or

"(e) The representative of a class of persons similarly situated designated as such with the approval of the court, of which the person is a member.

Restatement (Second) of Judgments § 85 (Tent. Draft No. 2, 1975).[12] Thus, the general rule that non-parties are not precluded is subject to the privity exception when a non-party was represented in the prior proceeding.

But this exception is itself subject to exception. Representation of a non-party will not always result in the same preclusive effects that bind parties.

"A person is not bound by a judgment for or against a party who purports to represent him if:

"(d) With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked, or

"(e) The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent."

*Id.* § 86. Courts considering the preclusive effects of representative litigation have noted this limit on the effects of such judgments. *See e. g., Hansberry v. Lee, supra,*

---

**12.** If a person was represented in the prior proceeding, a judgment may bind him even though he was not personally served. *See id.*, § 85(2).

311 U.S. at 42–44, 61 S.Ct. at 118–119 (conflicting interests of representatives and members of class prevent finding of res judicata that would infringe due process rights of non-parties); *Kersh Lake Drainage District v. Johnson, supra,* 309 U.S. at 491, 60 S.Ct. at 644 (judgment from representative litigation by indenture trustee binds bondholders unless there is fraud or collusion); *Kerrison v. Stewart, supra,* 93 U.S. at 160 (judgment from representative litigation by trustee binds beneficiaries unless there is fraud or collusion between the representative and the adverse party). Fairness requires that courts place these limits on the binding effects of judgments obtained by representatives. In the context of class actions and other types of representative suits, at some point the "represented" persons' interest in freedom from a flawed judgment overshadows policies against relitigation.[13] The exceptions listed in section 86 of the Restatement (Second) constitute instances when the "represented" persons' interests predominate. Thus, a holding within one of the exceptions is essentially equivalent to a finding that preclusion against the represented party would be a denial of due process.[14] In such cases the "represented" persons are not in privity with the "representative" parties.

In order to answer the privity question, we must first determine whether the Tribe is entitled to due process protection in this setting. The defendants suggest that due process offers the Tribe no comfort. They

13. The requisites for preclusion differ depending upon the type of representation. In a class action or a case of "virtual representation" by the government, a divergence of interests between the representative and the represented persons denies the judgment preclusive effects as against the latter. *See Hansberry v. Lee, supra,* 311 U.S. at 42–44, 61 S.Ct. at 118–119 (class action); *Southwest Airlines Co. v. Texas Int'l Airlines, Inc., supra,* 546 F.2d at 97–102 (virtual representation by government of private interests); *Aerojet Gen. Corp. v. Askew,* 511 F.2d 710, 719–20 (5th Cir. 1975) (virtual representation by state entity of county entity). On the other hand, a judgment obtained by a designated representative such as a trustee is subject to a different standard of review: the represented person is precluded unless there is fraud or collusion in the prior proceeding. *See e. g., Kerrison v. Stewart, supra,* 93 U.S. at 160; *see also,* Restatement (Second) of Judgments, *supra,* § 86 Comment f. On the issue of adequate representation, class actions are subject to greater scrutiny than are prior actions by a trustee or guardian. F. James & G. Hazard, *supra,* § 11.28, at 588. The different standards result from the different character of the representation in these cases.

"In action by or against the representative of a class, the thoroughness and vigor of the representation is properly subject to particular scrutiny because the bonds of responsibility between the representative and those for whom he acts are transitory and ordinarily not otherwise readily enforcible. Similar scrutiny is appropriate concerning the adequacy of representation in actions by or against a public agency or official where the judgment would have preclusive effects in an action by citizens or taxpayers concerning the same subject matter."
Restatement (Second) of Judgments, *supra,* § 86 Comment f.

Nevertheless, the same general principles control all these actions. "Although *Hansberry* involved a class action suit, its due process principles also control" the general application of res judicata. *Southwest Airlines Co. v. Texas Int'l Airlines, Inc., supra,* 546 F.2d at 95–96. *Cf.* Restatement (Second) of Judgments, *supra,* § 86 Reporter's Note, at 79 (*Hansberry v. Lee* "stands in any event as a reminder that there are constitutional limits on giving binding effect to litigation conducted through representatives"). The differing dimensions of preclusion among the different types of representative suits simply indicate that the balance struck for each depends on the different concerns presented by each situation.

14. This view indicates no more than that the exceptions to the preclusive effects of representative suits may be seen from a second perspective.

"In one sense this Section [86] is a list of exceptions to the general rule that a representative proceeding is binding on the person represented. It may also be considered as describing the situations in which the proceedings fail to conform to the necessary conditions for representation and application of the general principle that one is not bound by an adjudication to which he was neither a party nor represented by one. The provisions of this section are thus closely related to, if indeed they are not particularized expressions of, the requirements of due process, a fact which historically was obscured by the tendency of courts to see some of these questions in the context of necessary parties issues."
Restatement (Second) of Judgments, *supra,* § 86 Reporter's Note, at 79.

offer two reasons in support of this position. First, they claim that the federal-Indian relation is special and not subject to normal due process analysis. Second, they conclude that these Indians are not entitled to due process protection of these water rights, in any event, because the rights stem from an executive order reservation, a reservation that in the defendants' views creates an insufficient "property interest" for due process purposes. Neither of these reasons can withstand scrutiny.

We hold that the Tribe has a legally cognizable "property" interest in reservation property interests and therefore due process protections apply. The test of such interests appears in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims."

408 U.S. at 577, 92 S.Ct. at 2709.

To have a sufficient property interest the Tribe need not show that it may keep the water rights against all the world. The Supreme Court "has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." *Id.* at 571, 92 S.Ct. at 2706; see *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971). Indeed this court has held that Native Alaskans seeking land allotments from the Secretary of the Interior are entitled to a due process hearing before their applications are denied. *Pence v. Kleppe*, 529 F.2d 135 (9th Cir. 1976). The *Pence* Court reversed the district court's holding that the plaintiffs had no property interest in allotment lands which the Secretary could award in his discretion. *Id.* at 140–41. The courts have applied such logic in a variety of contexts. *See, e. g., Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (statutory entitlement to welfare benefits); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (interest in secured property). By these standards Indian water rights merit due process protection. The property interest asserted here is at least as great as the interest at stake in *Pence*.

A different result is not mandated just because this Tribe derives its water rights from executive order. In general, the government may retake executive order lands without compensation. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 325–30, 62 S.Ct. 1095, 1098–1101, 86 L.Ed. 1501 (1942).[15] But that rule does not mean that executive order lands or appurtenant rights may be taken without procedural due process. As this Court has recently stated: "As long as an executive order creating a reservation remains in effect, the Indian title to the reservation lands deserves the same protection as the Indian title to reservations created by treaty or statute." *United States v. Southern Pacific Transportation Co., supra*, 543 F.2d at 686. Thus, the question of a compensable interest in executive order lands is irrelevant, just as

---

**15.** In 1946 Congress enacted the Indian Claims Commission Act, which currently provides that the Commission shall hear and determine "claims in law and equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President...." 25 U.S.C.A. § 70a (West. Supp. 1979). This language provides jurisdiction in the Indian Claims Commission to hear claims based on executive order lands. *See Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 390 F.2d 686 (Ct.Cl.1962). However, the Act confers jurisdiction only as to claims arising before August 13, 1946, and presented to the Commission by August 13, 1951. *See* 25 U.S.C. § 70k; *Navajo Tribe v. United States*, 601 F.2d 536 (Ct.Cl.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980).

the question of a compensable interest in discretionary allotments was not an issue in the *Pence* case.

■ The defendants next claim that because of the "unique" Federal-Indian relation, government representation of Indians *per se* satisfies due process. Such a claim is one expression of the overly broad view that government control over Indian property is without limit. But the federal-Indian relation does not require a holding that faithless governmental acts against the Indians are not subject to review by the courts on due process grounds.

Case law dealing with compensation for taking of Indian rights provides a useful analogy. Authorities have long recognized that the United States stands in a trust position with respect to the Indians. This relation has been compared with that of guardian-ward. *See, e. g., Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). This guardianship concept has been used to relax court control. The government can thus take some actions that would otherwise seem confiscatory. F. Cohen, *Handbook of Federal Indian Law* 170–71 (1942). Actions taken by the United States in its trust capacity are not ordinarily subject to judicial review. Much as a fiduciary's management of trust assets need not be perfect, the government's good faith *management* of Indian property held in trust cannot be questioned by the courts. *See Lone Wolf v. Hitchcock, supra,* 187 U.S. at 565, 568, 23 S.Ct. at 221, 222.

■ But one would paint with too broad a brush if one concluded that cases such as *Lone Wolf* generally restrained the courts' scrutiny of the government's dealings with Indians. Plenary congressional power over Indians does not mean that congressional power over Indians is not subject to express limitations upon congressional power, such as the Bill of Rights. F. Cohen, *supra,* at 91 (citing *Stephens v. Cherokee Nation,* 174 U.S. 445, 19 S.Ct. 722, 43 L.Ed. 1041 (1879)). In cases where the government does not exercise good faith, judicial due process review protects the Indians. *See United States v. Creek Nation,* 295 U.S. 103, 110, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935); *Three Tribes of Fort Berthold Reservation v. United States,* 390 F.2d 686 (Ct.Cl.1968). The Supreme Court has recently reaffirmed that *Lone Wolf's* scope is limited to instances of good faith management. *See United States v. Sioux Nation of Indians,* 448 U.S. 371, 406–417, 100 S.Ct. 2716, 2736–2741, 65 L.Ed.2d 844, 871–76 (1980). Thus, the insulation accorded actions by the government-trustee does not apply to instances of governmental self-dealing because "[s]poliation is not management." *Shoshone Tribe v. United States,* 299 U.S. 476, 498, 57 S.Ct. 244, 252, 81 L.Ed. 360 (1937). When the government sheds its "trustee" role for one of "taker" the due process clause protects Indians' rights [16] by allowing compensation for the taking. Similar principles should control the *procedural* due process boundaries of the federal-Indian relation [17]—when the government as

---

16. The *Sioux Nation* Court limited its holding to Indian lands recognized by Congress because only those lands give rise to a compensable interest. *Id.* 448 U.S. at 415 n.29, 100 S.Ct. at 2740 n.29, 65 L.Ed.2d at 875 n.29. Although this limitation has meaning when determining what is compensable under the due process clause, such a limitation does not apply in the procedural due process setting, which does not hinge on the distinction between "rights" and "privileges".

17. Just as the *Lone Wolf* obstacle is illusory with respect to the Indians' entitlement to due process, so too are the other potential obstacles.

It is true that the federal-Indian relation must be evaluated in light of a special historical and legal context. Congress has constitutional authority to 'regulate commerce with . . . the Indian tribes.' U.S.Const. art. I, § 8, cl. 3. In addition, the United States historically used its treaty power to control Indian affairs. *See* F. Cohen, *supra,* at 89–91. Indians have long been dependent on the government, as a ward is dependent on a guardian. *See Cherokee Nation v. Georgia, supra,* 30 U.S. (5 Pet.) at 17, 8 L.Ed. 25; *United States v. Kagama,* 118 U.S. 375, 383–84, 6 S.Ct. 1109, 1113–1114, 30 L.Ed. 228 (1886). Thus, many actions may be insulated from strict judicial review. A preferential hiring of Indians in the BIA need only pass a rational basis test. *Morton v. Mancari,* 417 U.S. 535, 553–54, 94 S.Ct. 2474, 2484, 41 L.Ed.2d 290 (1974). But cases such as *Mancari* do not support a general rational basis test for

a trustee in good faith adequately represents the Indians they are bound by any ensuing judgment, but when administrative officials violate their trust, due process should prevent preclusion of the Indians to the extent it would protect similarly represented non-Indians.

The Tribe's rights in this case, thus, have familiar dimensions. In general, representation by the United States will bind an Indian tribe and the individual Indians. *See Heckman v. United States, supra,* 224 U.S. at 445–46, 32 S.Ct. at 434–435; *United States v. Emmons,* 351 F.2d 603, 604 (9th Cir. 1965); *Oklahoma v. United States,* 155 F.2d 496, 498 (10th Cir. 1946); *Creek Indians National Council v. Sinclair Prairie Oil Co.,* 142 F.2d 842, 845 (10th Cir.), *cert. denied* 323 U.S. 78, 65 S.Ct. 269, 89 L.Ed. 624 (1944); *Pueblo of Picuris v. Abeyta,* 50 F.2d 12, 13 (10th Cir. 1931); *Vinson v. Graham,* 44 F.2d 772, 779 (10th Cir. 1930), *cert. denied,* 283 U.S. 819, 51 S.Ct. 344, 75 L.Ed. 1435 (1931); *Winship v. Ricketts,* 32 F.2d 476, 479 (8th Cir. 1929). When the government breaches its trust to the Tribes while openly advancing its own interest the Tribe is not necessarily bound: [18]

[A] fiduciary does not bind those for whom he acts as against third parties who are aware of the fiduciary's failure to fulfill his responsibility. As applied to litigation, this principle implies that a judgment is not binding on the represented person where it is the product of collusion between the representative and the opposing party, or where, to the knowledge of the opposing party, the representative seeks to further his own interest at the expense of the represented person. Where the representative's management of the litigation is so grossly deficient as to be apparent to the opposing party, it likewise creates no justifiable reliance interest in the adjudication on the part of the opposing party."

Restatement (Second) of Judgments, *supra,* § 86 Comment f. We need address only the question as to the defendants' knowledge of government impropriety in the *Orr Ditch* litigation. We assume, but do not decide, that the government's representation of the Tribe in *Orr Ditch* was improper and inadequate.

The question is whether the *Orr Ditch* defendants were aware of a failure by the government to fulfill its responsibility to adequately represent the Tribe in the litigation. The answer to this question determines whether the *Orr Ditch* defendants

---

governmental actions involving Indians. In *Sioux Nation* the Supreme Court found *Mancari* to be an inapt analogy for determining whether the government acted in a trustee's or a taker's capacity. *Sioux Nation v. United States, supra,* 448 U.S. at 413 n.28, 100 S.Ct. at 2739 n.28, 65 L.Ed.2d at 875 n.28. It is also inapt in answering our question.

**18.** In none of the cases cited where the government represented Indians has the issue of inadequate representation arisen. Nevertheless, such a limitation to preclusion based on due process is proper. First, the leading case, *Heckman v. United States, supra,* 224 U.S. at 446, 32 S.Ct. at 435, in establishing its rule for preclusion, relied primarily on a case of trustee representation that explicitly placed a limit on preclusion in cases of fraud or collusion. *See Kerrison v. Stewart, supra,* 93 U.S. at 160. Second, neither the *Heckman* Court nor any other court has stated that preclusion against Indians applies despite fraud or collusion. En route to finding a group of Indians to be necessary parties, one court has recently distinguished *Heckman* as a case where the "Indians were adequately represented by their guardian,

the United States." *Manygoats v. Kleppe,* 558 F.2d 556, 558 (10th Cir. 1977). We can discern no reason why Indians should not be entitled to adequate representation and protection from fraud or collusion.

Indeed the rule espoused here receives substantial support from recent Indian intervention cases. Where there was a "conflict of interest between the proprietary interests of the United States" and the Indians, one court allowed intervention because "[i]n such a situation, adequate representation of both interests by the same counsel is impossible." *New Mexico v. Aamodt, supra,* 537 F.2d at 1106–07. *See also Cheyenne River Sioux Indians v. United States,* 338 F.2d 906 (8th Cir. 1964), *cert. denied,* 382 U.S. 815, 86 S.Ct. 34, 15 L.Ed.2d 62 (1965) (no right of Indians to intervene where government represented them in good faith). *Cf. Rincon Band of Mission Indians v. Escondido Mut. Water Co.,* 459 F.2d 1082, 1084–85 (9th Cir. 1972) (Indians' request for representation by United States denied where government's counsel would be faced with a conflict of interest.)

reasonably relied on the government's representation of the Tribe's interests. The district court found that any impropriety in the government's representation "was unknown to the defendants in *Orr Ditch.*" Finding no. 31, R. 5602. The plaintiffs do not challenge this finding. We cannot say it is clearly erroneous. Accordingly, the *Orr Ditch* defendants are entitled to rely on the final decree.

We cannot agree that public policy requires us to suspend the application of res judicata in this instance. Res judicata serves important policies. It fosters reliance on judicial decrees, eliminates expense to parties, conserves judicial resources, and minimizes the possibility of inconsistent results. *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). There are hardly maxims "more firmly established or of more value in the administration of justice, than those designed to prevent repetitious relitigation." *United States v. Throckmorton*, 98 U.S. 61, 65, 25 L.Ed. 93 (1878). We are not free to suspend the application of the *Orr Ditch* decree merely because we may think it erroneous. *Reed v. Allen*, 286 U.S. 191, 199–200, 52 S.Ct. 532, 533–34, 76 L.Ed. 1054 (1932); *Hatchitt v. United States*, 158 F.2d 754, 756 (9th Cir. 1946).

We do not minimize the policies that weigh against the finality of the decree. We place a high value on the nation's duty to protect Indian resources, consistent with congressional and constitutional standards. *Red Fox v. Red Fox*, 564 F.2d 361, 365 (9th Cir. 1977). We know of no means of measuring the value of Pyramid Lake. If restored, its fishery would have enormous worth. We are also mindful of the nation's interest in the survival of endangered species. *See* 16 U.S.C. § 1531 *et seq.* (Endangered Species Act); *Udall v. FPC*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967).

Nevertheless, we hold the policies served by res judicata preponderate. These policies apply with special force when titles to real property are involved. *Minnesota Mining Co. v. National Mining Co.*, 70 U.S. (3 Wall.) 332, 334, 18 L.Ed. 42 (1866); *United*

*States v. Title Insurance & Trust Co.*, 265 U.S. 472, 486–87, 44 S.Ct. 621, 623, 68 L.Ed. 1110 (1924). In recent years both Congress and the Supreme Court have recognized that finality in water adjudications cannot be attained when reserved rights remain unsettled. *See, e. g.*, 43 U.S.C. § 666 (McCarran Amendment); S.Rep. 755, 82d Cong. 1st Sess. (1951); *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 810–11, 96 S.Ct. 1236, 1242–1243, 47 L.Ed.2d 483 (1976). *And see Public Land Law Review Commission, One Third of the Nation's Lands* 144 (1970); 6 *Waters and Water Rights, supra*, § 530 at 516. There is no question that the *Orr Ditch* defendants and many others have relied heavily on the finality of the decree. The government's representation of the Tribe's interests in *Orr Ditch* was analogous to that of a faithless fiduciary who was nevertheless authorized to represent its beneficiary. We hold that the district court properly dismissed the action with respect to the *Orr Ditch* defendants and their successors in interest.

We also hold that subsequent appropriators who were not parties to *Orr Ditch*, but who have reasonably relied on the finality of the *Orr Ditch* decree, are entitled to rely on its finality. Clearly the government intended to enable such reliance when it consented to entry of the final *Orr Ditch* decree. To be sure, the government did not employ a statutory *in rem* procedure. *Orr Ditch* was an equitable *in personam* action whose res judicata effect would normally be limited to parties and their privies. But this was no garden variety quiet title action. It was a virtually comprehensive adjudication that approximated a statutory *in rem* proceeding, and avoided the defects associated with *in personam* water adjudications. The government framed its complaint in the broadest possible way, to assert the court's jurisdiction power over all water users on the river. It provided individual notice and widespread publicity of the action. As with Nevada procedure, great care was taken to assemble the most reliable and comprehensive data concerning

the parties' needs and the river's supply. Interested parties not represented by the government were given every opportunity to present their claims not just at one hearing, but repeatedly, in proceedings spanning years. There was adversity between the plaintiff and the defendants, all concerned perceived that adversity, and it could justly be supposed that the parties would assert all their claims and defenses. The resulting decree was drafted in broad terms, and the *Orr Ditch* parties were barred from relitigating in any way the claims determined.

In these circumstances it would be manifestly unjust to permit the *Orr Ditch* defendants to rely on the decree, and not to permit subsequent appropriators, defendants here, to do the same. *Cf. City of Los Angeles v. City of San Fernando*, 14 Cal.3d 199, 123 Cal.Rptr. 1, 537 P.2d 1250, 1273 (1975); Restatement of Judgments, *supra*, § 70. Any other conclusion would make it impossible ever finally to quantify a reserved water right.

2. Truckee-Carson Irrigation District [19].

As a general matter, a judgment does not conclude parties who were not adversaries under the pleadings. *Dobbins v. Barnes*, 204 F.2d 546 (9th Cir. 1953); Restatement of Judgments, *supra*, § 82; Restatement (Second) of Judgments, *supra*, § 82; 1B *Moore's Federal Practice, supra*, ¶ 0.411[2]; Vestal, *Preclusion/Res Judicata Variables: Parties*, 50 Iowa L.Rev. 27, 29 (1964). This is because "the rules of res judicata are based upon an adversary system of procedure which exists for the purpose of giving an opportunity to persons to litigate claims against each other." Restatement of Judgments, *supra*, § 82, Comment a. Where there is no adversity under the pleadings, co-parties may be bound only as to issues actually or necessarily litigated. *Town of Flagstaff v. Walsh*, 9 F.2d 590 (9th Cir.), *cert. denied*, 273 U.S. 695, 47 S.Ct. 92,

71 L.Ed. 844 (1926). *See also*, Restatement (Second) of Judgments, *supra*, Comment a; *Developments in the Law—Res Judicata*, 65 Harv.L.Rev. 818, 860–61 (1952); Annot., 24 A.L.R.3d 318 (1969).

A strict adversity requirement does not necessarily fit the realities of water adjudications. All parties' water rights are interdependent. *See Frost v. Alturas*, 11 Idaho 294, 81 P. 996, 998 (1905); Kinney, *Irrigation and Water Rights* at 277. Stability in water rights therefore requires that all parties be bound in all combinations. Further, in many water adjudications there is no actual controversy between the parties; the proceedings may serve primarily an administrative purpose. Lasky, *From Prior Appropriation to Economic Distribution of Water by the State—Via Irrigation Administration*, 1 Rocky Mt.L.Rev. 161, 188 (1929). Were we concerned only with parties or co-parties, we might be persuaded to relax the adversity requirement.

The Tribe and the Project were neither parties nor co-parties, however. They were non-parties who were represented simultaneously by the same government attorneys. In representative litigation we should be especially careful not to infer adversity between interests represented by a single litigant. The very idea of representative litigation is defeated if the representative asserts adverse claims simultaneously. Under most circumstances, such representation is by definition inadequate. *See Hansberry v. Lee, supra*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; *Manygoats v. Kleppe, supra*, 558 F.2d at 558; *Rincon Band of Mission Indians v. Escondido Mutual Water Co.*, 459 F.2d 1082, 1085 (9th Cir. 1972); *Olson v. Miller*, 263 F.2d 738, 740 (D.C.Cir.1959); *Green v. Brophy*, 110 F.2d 539, 542 (D.C.Cir. 1940); *In re Estate of Wiswall*, 11 Ariz.App. 314, 464 P.2d 634, 641 (1970); *Bogert on Trusts*, § 593 (2d ed. 1960). *But compare United States v. Nixon*, 418 U.S. 683, 94

---

19. The record does not reveal to what extent, if any, TCID or its members derive water rights apart from those decreed for the use of the Project in *Orr Ditch*. This section is intended to apply only to *Orr Ditch* water rights decreed to the government for the use of the Project. If TCID or its members derive water rights from any of the named defendants in *Orr Ditch*, or from subsequent appropriations not adjudicated in *Orr Ditch*, this discussion does not affect those rights.

S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). Rules of res judicata have evolved safeguards to ensure the integrity of representative functions. Restatement (Second) of Judgments, *supra*, § 80(2), Comment a. We would undermine those safeguards were we lightly to assume that the government intentionally represented conflicting interests.

By representing the Tribe and the Project against the *Orr Ditch* defendants, the government compromised its duty of undivided loyalty to the Tribe. *See* Restatement (Second) of Trusts, *supra*, § 170, & Comments p, q, r. The defendants suggest that the government assumed an even more compromising posture. They suggest that the government not only represented dual interests on the same side of a dispute, but that the government simultaneously, with the same lawyers, represented those dual interests in a dispute between themselves. This posture is completely alien to our adversary system and will not be inferred from ambiguous facts. Before we conclude that government officials have undertaken such representation in litigation, we must be faced with a pleading in which this posture is clearly assumed.

In this case, the government's assumption of such a posture would be especially anomalous because of the possibility of self-dealing at the expense of government wards. *See Navajo Tribe v. United States*, 364 F.2d 320 (Ct.Cl.1966). In determining what effect to give to ambiguous acts of administrative officials we must not draw conclusions that prejudice the government's Indian wards unless the government speaks its prejudicial intent clearly. *See United States v. Santa Fe Pacific R.R.*, *supra*, 314 U.S. at 354, 62 S.Ct. at 255; *United States*

*v. Southern Pacific Transportation Co.*, *supra*, 543 F.2d at 690. Thus, the requirement that adversity be established by pleadings is particularly compelling in this setting.

Both the government and the court were alert to the need to establish adversity among the co-defendants' claims.[20] The government was aware of the usual equity practice to file cross bills to set up adversity between co-parties. *See City of Owensboro v. Westinghouse, Church, Kerr & Co.*, 165 F. 385 (6th Cir. 1908); *Rickey Land & Cattle Co. v. Wood*, 152 F. 22 (9th Cir. 1907), aff'd, 218 U.S. 258, 31 S.Ct. 11, 54 L.Ed. 1032 (1910); *Ames Realty Co. v. Big Indian Mining Co.*, 146 F. 166 (C.C.D.Mont.1906). The government proposed to eliminate this practice in *Orr Ditch*, since the government's complaint and orders of the court had made it clear to all parties that the defendants' claims would be binding *inter se.*

It appears that no similar attention was given to adversity between the Reservation and the Project. Nor did the government file pleadings or the equivalent in which it was explicitly stated that the litigation would bind the Reservation and the Project *inter se.* It is clear from the record that the government did not perceive conflict between the claim it pressed on the Tribe's behalf and the claim asserted for the Project. As Truesdell, the Special Assistant U.S. Attorney in charge of the case said in 1919, the government "always had it in mind that there could be no conflict of interest between the Reclamation Project and the Indian reservation." Ex. U–88, at 4. The small reservation claim that was asserted could be satisfied by the return flow from irrigation below the headgate or the Truckee diversion canal. *Id.*[21]

---

**20.** See letter of August 7, 1918 from R. G. Withers, U.S. Dept. of Justice, to Hon. E. S. Farrington, U.S. District Judge. R. 2266–67.

**21.** In 1925 the *Orr Ditch* special master described the reservation claim as follows:

"Congress has passed an act providing for the allotment of a meager five acres per Indian. Why should anyone begrudge or object to allowing enough water for irrigation by

the Indians of these small tracts of land, and of the land they have under cultivation? Under similar conditions white men are not satisfied to try and making a living on such a small amount.... Men residing here for 50 years say the last year was dryest [sic] one they have known. Users above the reservation took all the water from the river last summer for irrigation on porous lands in the narrow valley, and the return flow was suffi-

We do not accept TCID's suggestion that it became an adverse party in its own right by participating in the negotiations that resulted in the Truckee River Agreement, or by signing that agreement, or by the court's incorporation of that agreement into the *Orr Ditch* final decree. The government was the plaintiff in *Orr Ditch*. It never relinquished or limited its representation of the Project's interests. The final decree confirms the Project's water rights in the government's name. TCID's negotiations with the government and other parties could not alone satisfy the requirement that adversity be explicitly established on the record, by pleadings.

■ Since there was no adversity under the pleadings between these two interests, the question is then whether the fishery claim asserted here was actually or necessarily litigated in *Orr Ditch*. The district court found "no evidence in this case that a *Winters* implied and reserved water right for fishery purposes was actually ever litigated in the course of the *Orr Ditch* proceedings." Finding No. 25, R. 5600. We agree with this finding. We must therefore reverse the judgment as to TCID.

We realize that this judgment results in hardship for TCID and its members. However, this is mitigated by several factors. First, TCID obtains water from two rivers, the Carson and the Truckee. Even if the Tribe succeeds in establishing its entitlement to substantial additional Truckee River water, it is possible that much of the TCID's need could be satisfied by Carson River water. Second, the Newlands Project is relatively inefficient in its use of water. *See Pyramid Lake Tribe v. Morton, supra,* 354 F.Supp. at 257. Improvements in water storage and distribution could result in substantial efficiencies to ameliorate any hardship to TCID. Third, TCID's right to water is based only in part on the government's representation of TCID's interests in *Orr Ditch*. Their rights are also founded on contracts with the government.[22] If the government breaches its contractual obligations to TCID and its members, traditional remedies may afford protection. Finally, TCID's hardship was avoidable. Either the government or TCID could have taken steps to assure that adversity was clearly established on the record, and they failed to do so.

Accordingly, we reverse the district court's judgment insofar as it dismissed the plaintiffs' complaint against TCID

### III. Ratification.

■ The defendants argue that Congress has ratified the *Orr Ditch* decree, and so it must be given preclusive effect. The district court found that Congress ratified the taking of the fishery, primarily by passing the Washoe Project Act of 1956, 43 U.S.C. § 614 *et seq.* There Congress noted the deterioration of the Pyramid Lake fish-

---

cient for the Indians to produce good crops without depriving the defendants from taking all the water above."
Special Master's Report at 37–38.

In 1922 one of the government's attorneys, Ethelbert Ward, declined to bring to the court's attention complaints that the Indians were not getting enough water to irrigate their crops. "In effect this controversy is one between the Indian Service and the Reclamation Service.... This matter it seems to me ought to be settled by the Interior Department as between its two bureaus...."
Ex. U–123. *And see* Ex. U–24. This implies that conflicts between the two interests were perceived as administrative matters, not questions for litigation.

22. TCID's right to water is based in part on its 1926 contract with the government. In that contract the government agreed to deliver water to TCID for distribution to Project water users. Individual water users represented by TCID in this litigation have their own contract rights. Some water users have contracts directly with the government, under which the government promises to deliver certain quantities of water. Other water users' rights are based on contracts with TCID which, at least in some cases, are approved by the government. *See* R. 1142–48. Though Project water users' rights originate from contracts, this does not mean that they have no ownership interest in them. *See Ickes v. Fox,* 300 U.S. 82, 57 S.Ct. 36, 81 L.Ed. 388 (1937); Trelease, *Reclamation Water Rights, supra,* 32 Rocky Mt.L.Rev. 477–81; 2 *Waters and Water Rights, supra,* § 117.3, at 176–77. Nevertheless, it is clear that the water users represented by TCID trace their rights to the contracts mentioned above.

ery "due in large measure to the construction by the Federal Government of the Newlands Project." The Washoe Project Act authorized efforts to restore the fishery. The district court held that this (1) confirmed "Congress' awareness of past acts;" and (2) ratified those acts "by its attempts to restore the fishery."

■ Ratification occurs where Congress adopts prior acts with "full knowledge of the relevant facts." *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 102–03 n.28 (9th Cir. 1970). *See Shoshone Tribe v. United States, supra,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360; *United States v. Creek Nation, supra,* 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331. The legislative history of the Washoe Project Act shows Congress was aware: (1) that the fishery had deteriorated; and (2) the federal government's development of the Newlands Project was largely the cause of the deterioration. There is no indication that Congress knew that the Tribe might have a reserved water right for the fishery or that the right was extinguished in *Orr Ditch.* Further, nothing in the record or the legislative history suggests that by authorizing efforts to restore the fishery Congress intended to sanction federal actions that had contributed to the fishery's destruction. Accordingly, we hold Congress has not ratified the government's actions in the *Orr Ditch* proceedings.

### IV. Other Arguments.

■ The parties make a number of other arguments which were not accepted by the district court. We deem it unnecessary to discuss them in detail. We reject the Tribe's argument based on section 16 of the Indian Reorganization Act. We cannot agree that the government's handling of the Reservation's interests in the *Orr Ditch* case constituted a "disposition" of tribal assets within the meaning of that section. See discussion at 1300 *supra.* We also reject TCID's argument that the Tribe is bound by the *Orr Ditch* decree because in 1974 it sought to enforce that decree against the defendants. TCID's argument is based on the much-criticized former Equi-

ty Rule 37. *See* 3B *Moore's Federal Practice, supra,* ¶ 24.16[1] at 591; *Spiller v. St. Louis & San Francisco R.R.,* 14 F.2d 284 (8th Cir. 1926), *rev'g North American Co. v. St. Louis & San Francisco R.R.,* 288 F. 612 (D.Mo.1922). No comparable provision was included in the revised Federal Rules of Civil Procedure. *Compare Spangler v. United States,* 415 F.2d 1242 (9th Cir.1969). We see no inequity in permitting the Tribe to seek to enforce the *Orr Ditch* decree against the defendants while also seeking additional water rights in this proceeding. By intervening the Tribe did not assert the validity of the *Orr Ditch* decree against itself. *Compare Davis v. Wakelee,* 156 U.S. 680, 691, 15 S.Ct. 555, 559, 39 L.Ed. 578 (1895). Rather, it attempted to hold the defendants to rights confirmed in the *Orr Ditch* decree. This is not inconsistent with its claim for additional waters. *See Embry v. Palmer,* 107 U.S. 3, 2 S.Ct. 25, 27 L.Ed. 346 (1882).

### V. Conclusion.

We conclude that the *Orr Ditch* proceedings withstand the plaintiffs' collateral attack, in the main. Notwithstanding the government's questionable representation of the Tribe's interests, there is sufficient reason for us to give the decree preclusive effect with respect to the *Orr Ditch* defendants, their successors, and subsequent appropriators who reasonably relied on the decree.

We reach a different conclusion with respect to the Truckee-Carson Irrigation District. Its interests were represented by the government in the *Orr Ditch* proceedings in such a way that there was no opportunity to adjudicate its interests as against the Tribe's. We therefore remand this case to the district court to adjudicate priorities between those interests.

On remand the district court must determine whether the Tribe is entitled to a water right for its fishery. We express no opinion on that question. If the Tribe is adjudged to have such a right, it is of course limited to a quantity of water "necessary to fulfill the purposes of the reserva-

tion, no more." *Cappaert v. United States, supra,* 426 U.S. at 141, 96 S.Ct. at 2071. And, of course, any additional water due the Tribe must come from water rights decreed to the government in *Orr Ditch.* Neither the Tribe nor the government may expand its water rights beyond the limits of government rights decreed in the original proceeding. We also believe it important to bear in mind the nature of the right the Tribe seeks in this litigation. As the Tribe points out in its brief:

> "[The fishery right] does not require the delivery of fixed quantities each and every day, month, season or year. Unlike the other kind of water right, the water required for fishery purposes will have its least impact in dry years when water is most scarce. In dry years the water would not do [the fishery] any good."

Tribe's Opening Brief at 21–22.

Given this flexibility in the right the Tribe seeks, we are hopeful that on remand the district court and the parties can formulate a solution that will minimize hardships on all water users.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

SCHROEDER, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the majority opinion except that portion which permits a partial reopening of the *Orr Ditch* litigation to consider the claim of the Tribe against the Truckee-Carson Irrigation District. My partial dissent is with respect and regret, for the fate that has befallen the once beautiful Pyramid Lake is indeed sorrowful.

I dissent because the majority opinion creates an exception to the principles of res judicata applicable to general water adjudications, and the effect of today's ruling may have disruptive repercussions beyond the shores of Pyramid Lake.

The majority opinion, correctly in my view, rejects the broad contention of the government that its own, belatedly perceived, conflict of interest in representing both the Irrigation District and the Tribe requires the *Orr Ditch* decree to be re-

opened completely. In the bygone era in which irrigation and reclamation ranked supreme, the conflicting relationship between those interests and possible other reserved Indian water rights was not clearly perceived. The majority properly recognizes, as the district court found, that there could have been no public perception of any impropriety in the government's conduct of this litigation which would preclude reliance upon the decree. *See* Restatement (Second) of Judgments § 86 (Tent. Draft No. 2, 1975).

The majority's limited reopening is more narrowly perched upon the principle of "adverseness under the pleadings," a concept most commonly applied to co-parties in tort litigation. The majority applies that concept here because the claims of the Tribe and TCID were both set forth in the government's complaint. The majority concludes that those claimants are bound only by matters which were actually litigated, and not as to any claims which could or should have been determined in that litigation.

This action, however, as the district court found and the majority accepts, was intended by all concerned to be a "general all inclusive water adjudication suit which sought to adjudicate all rights and claims in and to waters of the Truckee River and its tributaries ... to the end that its decree would determine the relative rights of the parties thereto." The government filed the action in order to determine all prior rights to the water and to establish the amount of water available to TCID. In such litigation, the fact that claimants may be denominated plaintiffs or defendants has no effect on the application of res judicata. All are adverse to each other.

This principle has been repeatedly observed by courts of the western United States in dealing with similar adjudications. For example, the Idaho Supreme Court in *Morgan v. Udy,* 58 Idaho 670, 79 P.2d 295 (1938), was faced with the contention that parties to an adjudication had not been adversaries and thus principles of collateral

estoppel as opposed to res judicata applied. The court quoted from *Frost v. Alturas Water Co.*, 11 Idaho 294, 301, 81 P. 996, 998:

'... in the settlement of cases of this character every user of water on the stream and all of its tributaries in litigation are interested in the final award *to each claimant.* \* \* \* *Every claimant of the water* of either stream \* \* \* *is interested in a final adjudication of all* the claimants of all the waters that flow to the claimants at the lower end of the stream after its junction. In other words, in my view of the question presented by the demurrer, it matters but little who are plaintiffs and who are defendants in the settlement of cases of this character; the real issue being who is first in right to the use of the waters in dispute.' (Italics ours.)

58 Idaho at 681, 79 P.2d at 299. In an equitable quiet title action very similar to the *Orr Ditch* litigation, the Nevada Supreme Court decided whether non-appealing defendants were "adverse" parties entitled to be served with a notice of appeal. *Pacific Live Stock Co. v. Ellison Ranching Co.*, 52 Nev. 279, 286 P. 120 (1930). The court concluded that they were "adverse," stating:

In a suit to quiet title to water rights, such as this, the main purpose is to determine the respective rights of the parties to the use of the water. A decree which leaves the controversy between the parties unsettled, unadjudicated, undetermined, and subject to future litigation, defeats the very purpose for which the action is brought. 3 Kinney, Water Rights (2d ed.) § 1557.

*Id.* at 296, 286 P. at 123.

The majority decision here, of course, rests not only upon the form of the pleadings but upon the fact that the government,

at least formally, was representing both the Irrigation District water users and the Tribe. This, however, as we all agree, was not generally understood to have involved any impropriety during the course of the *Orr Ditch* litigation. The users of the Truckee-Carson Irrigation District waters, like the *Orr Ditch* defendants, have relied on the finality of the *Orr Ditch* decree for nearly two generations. The majority does not suggest, nor did the district court find, that the TCID users were any more aware of improprieties in the government's conduct than the other users who were parties to the action.

As the majority points out, the hardship of today's ruling on TCID may be eased by the availability of other remedies. In such circumstances, today's ruling may well be viewed as a fair and equitable redress for the loss of fishery rights and the damage done to Pyramid Lake. However, the applicability of today's ruling to other water adjudications involving Indian interests was not briefed in this case and is not known to this panel. I understand today's ruling to apply only to a situation in which the government, in the complaint, asserted claims on behalf of an Indian tribe as well as other water users who were not parties to the litigation. No claim has been made that this situation is unique.[1]

The underlying conflict between pursuit of reclamation interests and reserved Indian rights has been the subject of calls for congressional action. *E. g.*, Chambers, Discharge of the Federal Trust Responsibility to Enforce Legal Claims of Indian Tribes: Case Studies of Bureaucratic Conflict of Interest, 91 Cong., 2d Sess. (Comm. Print 1970) Study of Administrative Conflicts of Interest in the Protection of Indian Natural Resources, Subcomm. on Admin. Prac. and Procedure of the Senate Comm. on the Ju-

---

1. Many water adjudications undoubtedly lie outside the scope of today's ruling. For example, the *Kent* decree, *Hurley v. Abbott*, No. 4564 Decree, Dist.Ct.3rd Judicial Dist., Maricopa Co. (1910) underlies the water distribution in Central Arizona. That decree has been cited along with the *Orr Ditch* decree as an example of conflict of interest. Federal Protection of Indian Resources, Hearings Before the Subcomm. on Elections of the Senate Judiciary Comm., 92nd Cong., 1st Sess. (1971) (statement of W. H. Veeder). It is not within the scope of today's decision, however, since the government there made all land owners within the district parties defendant.

diciary; Veeder, Federal Encroachment on Indian Water Rights and the Impairment of Reservation Development, 91 Cong., 1st Sess. (Comm. Print 1969) Toward Economic Development for Native American Communities, Subcomm. on Economy in Government of the Joint Economic Comm. In my view that approach is preferable to one which erodes long standing principles of finality in water adjudications.