**UNITED STATES of America,**
**Plaintiff,**

v.

**ORR WATER DITCH CO.,**
**et al., Defendants.**

**In re: The Matter of Nevada State**
**Engineer Ruling No. 5185.**

**No. (EQUITY) A–3–LDG.**

United States District Court,
D. Nevada.

March 9, 2004.

Michael L. Wolz, Nevada State Bar # 4801, Deputy Attorney General, Carson City, NV, for Nevada State Engineer.

Brent T. Kolvet, Esq., Nevada State Bar # 1597, Reno, NV, for North Valley Holdings, LLC.

## OPINION

GEORGE, District Judge.

Pursuant to Claim No. 1 of the *Orr Ditch Decree*, the Tribe has a water right to a maximum of 14,742 acre feet of water per year to irrigate 3,130 acres of Reservation bottom lands. In October 2001, the United States and the Tribe filed an application with the Nevada State Engineer to temporarily transfer (for the period of one year) the place and manner of use of 9,914 acre feet of Claim No. 1 water from the irrigation of Reservation bottom lands to in-stream use in the Truckee River. In December 2002, the State Engineer granted the application in the amount of 8,420 acre-feet annually.

Pursuant to Claim No. 2 of the *Orr Ditch Decree*, the Tribe has a right to a maximum of 15,344.55 acre feet of water per year to irrigate 2,745 acres of Reservation bench lands. In June 2001, the United States and the Tribe filed an application with the Nevada State Engineer to temporarily transfer (for one year) the place and manner of use of the entire Claim No. 2 water right from the irrigation of Reservation bench lands to in-stream use in the Truckee River. In the same December 2002 ruling, the State Engineer granted the application in the amount of 11,254.5 acre-feet annually.

Both temporary transfer applications were opposed by various parties, including the Truckee–Carson Irrigation District and the City of Fallon.

In his ruling granting the applications, the State Engineer held that the water rights adjudicated by both Claim No. 1 and Claim No. 2 of the Orr Ditch Decree were federal reserved water rights; that is, water rights that were implicitly reserved as part of the creation of the Tribe's Reservation. As such, the State Engineer held that the transfer applications could not be challenged on the state law basis that the underlying water rights were not perfected, or were abandoned or forfeited. The State Engineer further ruled that the transfer applications sought to apply the water to a primary purpose (fishery) of the Tribe's Reservation. As such, the State Engineer held that the Tribe did not need to "apply" for the water as if it was a new water right, but that the Tribe merely needed to satisfy the "transfer" requirements of state water law. As to the issues whether the place and manner of use could appropriately be changed, the State Engineer further concluded that the transfer would not be detrimental to existing users and would not be against public interest. Accordingly, the State Engineer granted the transfers subject to the payment of statutory fees. In addition, the State Engineer ruled that the Tribe and the United States could only implement the requested transfers pursuant to Alternatives 3 or 4 of the Environmental Assessment.

The Irrigation District and Fernley appeal the State Engineer's ruling, and the United States and the Tribe cross-appeal.

*The Status of Orr Ditch Decree Water Rights Under Claims No. 1 and 2*

█ As noted by the Irrigation District, at the heart of this matter is the legal status of Claims No. 1 and No. 2 of the Orr Ditch Decree. As to that issue, the threshold question is whether the water rights recognized by these two Claims are federal reserved water rights or state water rights. The United States Supreme Court reiterated, in *Winters v. United States,* 207 U.S. 564, 577, 28 S.Ct. 207, 52 L.Ed. 340 (1908), that at the time the federal government establishes an Indian reservation, it has the power to reserve water, exempting it from appropriation under state law. Subsequently, in *Cappaert v. United States,* 426 U.S. 128, 141, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), the Court established that the amount of water reserved is that amount reasonably necessary to fulfill the purpose of the reservation. These decisions reveal that the basis, measure and limit of a federal reserved water right is the creation and purpose of the reservation for which the water was reserved. By contrast, under Nevada's water rights laws, "[b]eneficial use shall be the basis, the measure and the limit of the right to the use of water." Nev.Rev.Stat. § 533.035.

█ Accordingly, while the priority date of a state water right is measured from the date on which beneficial use first begins,[1] the priority date of a federal reserved water right is measured from the date the reservation was created and the lands withdrawn from the public domain. The measure of the water duty of a state water right is also different from the measure of the water duty for a federal reserved right. Under state law, the water duty is equal to that amount of water that the appropriator puts to beneficial use. The duty of the federal reserved right, by contrast, is measured by that amount of water sufficient to meet the purpose of the reservation. Finally, federal reserved rights are sharply distinguished from state water rights in that the latter can be lost pursuant to the doctrines of forfeiture, abandonment, and the failure to perfect. Each of these doctrines reflects and promotes beneficial use as the basis, measure and limit of an appropriated water right. As beneficial use is not the basis, measure, or limit of a federal reserved water right, these doctrines are inapplicable to federal reserved rights.

█ All parties concur that the water rights adjudicated in Claim No. 1 of the Orr Ditch Decree are federal reserved water rights. The Irrigation District argues, however, that the water rights adjudicated in Claim No. 2 are not federal reserved rights, but are "decreed rights" arising solely as "a product of negotiations" between the original parties to the Orr Ditch litigation. In support of this argument, the Irrigation District relies upon the language of the Orr Ditch Decree, and upon the language of the Truckee River Agreement. For the reasons enumerated below, the court finds that the water right adjudicated in Claim No. 2 is also a federal reserved water right.

█ The adjudication of a water right is irrelevant to the determination whether the water right is a federal reserved right or a state water right. Regardless of whether a stream adjudication is resolved by consent, negotiation, or litigation, the underlying adjudicated water right must arise under either federal or state law.

---

1. However, pursuant to Nevada's relation back doctrine, the date of such beneficial use relates back to the date that the appropriator first begins construction of diversion works.

Contrary to the arguments of the Irrigation District, stream adjudications do not and cannot create water rights independent of state or federal law. At most, a stream adjudication and the resulting decree can only recognize water rights that exist pursuant to either state or federal law. Conversely, parties to a stream adjudication cannot agree to create an autonomous water right lacking any basis in a governing sovereignty. Rather, they can only agree that the claiming party could prove a right to the water under the law of either the federal or state sovereignty. In this case, the only conclusion that can be appropriately drawn from the parties' negotiated settlement of Claim No. 2 is that they agreed the United States could establish the Tribe's right to such water pursuant to either state or federal law. Accordingly, the Irrigation District's argument that Claim No. 2 is a "decreed" right fails, as it is irrelevant to the relevant issue whether the water right arose under state or federal law.

As to whether Claim No. 2 is a state water right or a federal reserved right, the language of the Orr Ditch Decree is dispositive and establishes that the Claim is a federal reserved water right. The Orr Ditch Decree establishes that both Claims No. 1 and 2 have a priority date of December 8, 1859. The Decree also establishes, as a finding of fact, that December 8, 1859 is the date on which the lands of the Reservation were withdrawn from the public domain for the use and benefit of the Tribe. Neither Claim No. 1 nor No. 2 contain any findings establishing that the Tribe diverted water from the Truckee River on December 8, 1859 or that the Tribe initiated construction of diversions works on this date. As such, both Claims No. 1 and No. 2 measure the priority date from the creation of the reservation, an attribute of a federal reserved water right. Conversely, neither Claim No. 1 nor No. 2 contains any finding of fact relevant to the date that beneficial use began. As neither Claim measures the priority date from the date of beneficial use, neither Claim adjudicates a state water right.

The Irrigation District notes that only the first paragraph of Claim No.1 expressly contains a finding of fact and conclusion establishing that federal reserved water rights were established in conjunction with the Reservation, and that Claim No. 2 lacks similar language. This distinction, the Irrigation District concludes, indicates that Claim No. 2 did not arise from the federal rights reserved in conjunction with the creation of the Reservation.

While Claim No. 2 lacks the express factual finding that the Reservation was withdrawn from the public domain on December 8, 1859, and that water rights were reserved to the Reservation on that date, Claim No. 2 also fails to expressly recite any other factual finding supporting its priority date of December 8, 1859. Further, the only factual finding within the Orr Ditch Decree supporting a December 8, 1859 priority date is the finding within Claim No. 1 that the Reservation was withdraw on such date. The court also notes that Claim No. 2 begins by specifically reciting that the rights awarded pursuant to that claim are "in addition to" the water rights awarded in Claim No. 1. Given the absence of any express factual finding in Claim No. 2 to support the awarded priority date of December 8, 1859, and the absence of any factual finding in the Orr Ditch Decree that the Tribe actually diverted water or initiated construction of diversion works on December 8, 1859, the words "in addition to" necessarily incorporate the language from Claim No. 1 that the Reservation was withdrawn from the public domain on December 8, 1859, and that Claim No. 2 arises from water rights that were reserved to the Reservation on that date.

That both Claims No. 1 and 2 are federal reserved water rights is further confirmed by the history of those claims, which history has been previously recognized and relied upon by this court and by the Supreme Court of the United States. Immediately after withdrawing the lands of the Newlands Reclamation Project, the United States posted notices that it was appropriating all unappropriated water of the Truckee, and specifically claimed 1,500 cubic feet of water per second. *United States v. Truckee–Carson Irrigation District,* 649 F.2d 1286, 1290 (1981), *reversed on other grounds, Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). When the federal government initiated the Orr Ditch litigation, it asserted a claim to 10,000 cubic feet of water per second for the Project, and 500 cubic feet of water per second for the Reservation.[2] *Id.,* at 1291.

As construction of the diversion works progressed, two distinct areas of irrigable land *within* the Reservation were identified: approximately 2,400 acres of bottom lands that were irrigable without the Newlands Reclamation Project, and about 19,-000 acres of bench lands that could be made irrigable by the Reclamation Project. *Id.* Pursuant to the authority of the Section 26 of the Act of April 21, 1904, ch. 1402, 33 Stat. 225, the plan for the 19,000 acres of bench lands that could be made irrigable was to allot each Indian five acres of land, and to dispose of the remaining acreage to settlers as if it were in the public domain pursuant to "the provisions of the [1902] reclamation Act." As noted previously by this court, " '[i]t seem[ed] clear that under the doctrine of the Winters case the original Indian withdrawn water right would attach to each of these five acres that the Indians are to have, but

the rest of the 19,000 acres which will be irrigated by the works of the project will have to depend for their water right upon the general project water right.' " 649 F.2d at 1291 (citing Ex. U–88 at 2). As noted by the Supreme Court, "Congress abandoned the plan, however, before it was ever implemented. Act of June 18, 1934, ch. 576, § 1, 48 Stat. 984. *See* 649 F.2d 1286, 1294 (C.A.9 1981)." *Nevada v. United States,* 463 U.S. at 117 fn. 2, 103 S.Ct. 2906. When it became apparent that the Reservation bench lands would not be sold to settlers, the government briefly considered asserting a reserved right sufficient to irrigate the entire 19,000 acres of Reservation bench lands on behalf of the Indians. Ultimately, however, the government agreed to a claim of water rights sufficient to irrigate just 2745 acres of Reservation bench lands, which agreement is memorialized in Claim No. 2 of the Orr Ditch Decree. 649 F.2d at 1295. This history confirms that the Tribe's right to water for the bench lands is the federal implied right that was reserved in conjunction with the creation of the Reservation. Accordingly, the court finds that both Claims No. 1 and No. 2 are federal reserved water rights.

*State Water Law*

▮ In its opposition to Fallon's and the Irrigation District's petitions, the United States and the Tribe argue that the federal reserved rights are not subject to state law, either substantive or procedural. The Tribe further suggests that Nevada's procedural law may be adopted as federal procedural law governing its rights.

In determining this issue, the Court notes that this matter comes before the court pursuant to the Tribe's application to temporarily change the place and manner

---

**2.** The eventual total water rights awarded to the Tribe in Claims No. 1 and 2 represents a small fraction of the amount originally claimed by the United States on behalf of the Tribe.

of use of water rights that were adjudicated by the *Orr Ditch Decree*. The *Orr Ditch Decree* specifically provides that

> [p]ersons whose rights are adjudicated hereby, their successors or assigns, shall be entitled to change, in the manner provided by law the point of diversion and the place, means, manner or purpose of use of the waters to which they are so entitled or of any part thereof, so far as they may do so without injury to the rights of other persons whose rights are fixed by this decree.

The Ninth Circuit has made plain that the phrase "in the manner provided by law" means that "[n]ot only state water law substance ..., but procedure as well, governs *Orr Ditch* water rights." *United States v. Orr Water Ditch Co.*, 914 F.2d 1302, 1307–1308, (9th Cir.1990). Nevertheless, in the *Alpine* litigation, the Ninth Circuit has recognized that "state water law will control the distribution of water rights to the extent that there is no preempting federal directive." *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 858 (9th Cir.1983).

Finally, the court would note that the *Orr Ditch Decree* represents a settlement of the litigation initiated by the United States. All parties to the original *Orr Ditch* litigation, including the Tribe through the United States, agreed that any proposed change to the place or manner of use would be accomplished "in the manner provided by law," and the Ninth Circuit has established that the manner provided by law is state substantive and procedural law except to the extent there is a preempting federal law. Accordingly, the Court will apply state substantive and procedural law to the Tribe's *Orr Ditch* water rights except where applicable federal law governing those rights preempts state law.

*Forfeiture, Abandonment, or Lack of Perfection.*

■ Fallon and the Irrigation District argue that, regardless of whether Claims No. 1 & 2 are federal reserved water rights, they are subject to forfeiture, abandonment and lack of perfection. They suggest that Claims No. 1 & 2 should receive identical legal treatment as water rights deriving from Claims No. 3 and 4. They reason that, as the Ninth Circuit has ruled that water rights derived from Claims No. 3 & 4 are subject to these doctrines, therefore Claims No. 1 & 2 should receive the same treatment. The Court finds that the federal exemption from appropriation of the Tribe's water rights preempts state substantive law regarding forfeiture, abandonment or lack of perfection.

Congress expressly established that the basis, measure and limit for water rights in Claims No. 3 & 4 is different from that of Claims No. 1 & 2. In the Reclamation Act, Congress recognized that "beneficial use shall be the basis, the measure, and the limit of the right" to use water acquired under the Act, including the Newlands Project. As beneficial use is the foundation of the doctrines of forfeiture, abandonment, and lack of perfection, these doctrines are appropriately applied to water rights derived from Claims No. 3 and 4 of the Orr Ditch Decree. By contrast, the water rights adjudicated in Claims No. 1 and 2 were not acquired under the provisions of the Reclamation Act. Rather, those rights were reserved with the creation of the reservation in 1859, and were thus exempted from appropriation. Being federal reserved water rights, the basis, measure, and limit of Claims No. 1 and 2 is the creation and purpose of the Reservation, rather than beneficial use.

Fallon also argues that Claims No. 1 & 2 became subject to forfeiture, abandon-

ment, or lack of perfection at the time the respective water duties for these Claims were quantified by the Orr Ditch Decree. The argument fails because, pursuant to *Cappaert,* the legal basis for quantifying the water duty of a federal reserved water rights, such as those recognized under Claims No. 1 & 2, is the amount of water necessary for the purposes of the Reservation. By contrast, pursuant to state law, the legal basis for quantifying the water duty of an appropriated water right is beneficial use. Similarly, pursuant to the Reclamation Act, the legal basis for quantifying the water duty of a Claim No. 3 or 4 water right is also beneficial use. Accordingly, the quantification of the water duty in Claims No. 1 & 2 did not render those claims subject to the doctrines of forfeiture, abandonment, or lack of perfection.

In sum, the court holds that the doctrines of forfeiture, abandonment, or lack of perfection are not applicable to the water rights in Claims No. 1 & 2.

*Exclusion of Evidence.*

 Fallon and the Irrigation District argue that the State Engineer improperly excluded evidence regarding whether Claims No. 1 & 2 are federal reserved water rights, and whether the rights have been forfeited or abandoned, or have not been perfected. The court finds that exclusion of evidence on the issue whether Claims No. 1 & 2 are federal reserved water rights was appropriate. As noted previously, the legal status of Claims No. 1 & 2 as federal reserved water rights was conclusively resolved by the Orr Ditch Decree and is not subject to further litigation. Accordingly, the State Engineer properly excluded evidence on this issue.

The State Engineer's exclusion of evidence on the issue whether the water rights were lost through abandonment, forfeiture, or lack of perfection was also appropriate. As established above, these doctrines do not apply to the federal reserved water rights in Claims No. 1 & 2.

*Primary Purpose of Reservation*

 The Irrigation District argues that, pursuant to the Orr Ditch Decree, irrigation is the only purpose for the which the water in Claims No. 1 and 2 was reserved, and that fishery is a secondary purpose. As such, it asserts that the Tribe cannot transfer water righted pursuant to Claims No. 1 and 2 to this secondary purpose, but must acquire a new water right in the same manner as any other appropriator.

The Tribe and the United States argue that the Irrigation District's argument fails because the Tribe can properly transfer its reserved water rights to any lawful purpose, not merely the primary purposes of the Reservation. Further, the Tribe and the United States argue that the State Engineer erred when it rejected the Irrigation District's argument on the basis that fishery is a primary purpose of the Reservation, rather than on the basis that the Tribe can apply the water to any lawful purpose.

The Tribe and the United States do not dispute the State Engineer's finding that fishery is a primary purpose of the Reservation. Further, the Irrigation District is plainly incorrect in its assertion that the *Orr Ditch Decree* established that irrigation was the sole primary purposes for which the Pyramid Lake Indian Reservation was created. Rather, the Orr Ditch Decree merely adjudicated a permissible place and manner of use of the Tribe's federal reserved water rights.

As Justice Brennan indicated in his concurring opinion in *Nevada v. United States,* the Tribe's federal reserved water right included a right "to water to maintain the fishery." 463 U.S. at 146, 103 S.Ct. 2906, fn*. Further, the basis of the Supreme Court's ruling in *Nevada v. Unit-*

*ed States* was that the Orr Ditch litigation adjudicated the entirety of the Tribe's reserved water rights, including those rights necessary to maintain the fishery. As the United States alleged in its initial Orr Ditch complaint, a purpose of the Reservation was to protect the Indians and their descendants in fishing. Further, this court previously held that maintaining the historic Pyramid Lake fishery for the Tribe was a purpose underlying the creation of the Reservation. In sum, the court finds that fishery is a primary purpose of the Reservation, and that the State Engineer did not err in so finding. Because fishery is a primary purpose of the Reservation, the Irrigation District's argument is without merit.

To be certain, by rejecting the Irrigation District's argument on the basis that the Irrigation District is incorrect in its assertion that fishery is a secondary purpose, the court is not ruling that the Tribe is limited to applying its reserved water rights to a primary purpose of the Reservation. Conversely, the Court is not ruling that the Tribe can apply its water to any lawful purpose. The court has simply not addressed that issue because it is not necessary to resolution of the petitions presently before the court. In the matter before the court, the Tribe seeks to apply its federal reserved water rights to fishery, and fishery is plainly a purpose to which the Tribe can apply its federal reserved water rights.

*Staleness of Applications*

Fallon and the Irrigation District argue that the temporary transfer applications must be denied as moot. They note that the applications were filed in 2001, that the State Engineer did not hold an evidentiary hearing until June 2002 and entered his ruling December 2002. Since then, the matter has been before this court. They conclude that, as the earliest that the Tribe can apply water to the proposed new use is 2004, the evidence in support of the applications is stale and not relevant to the 2004 irrigation year.

The court disagrees that this matter has become moot. Having reviewed the record, the court finds that the evidence presented to the State Engineer remains sufficient to permit an appropriate resolution of the appeals.

*Impairment of Existing Rights*

Although the Tribe's federal reserved water rights in Claims No. 1 and 2 concern water that is exempted from appropriation, and the Tribe's rights are not subject to abandonment, forfeiture, or failure to perfect, nevertheless, the rights are subject to other state law requirements governing procedural and substantive administration of water rights on the Truckee River. Perhaps most critical to the present matter is the requirement that a change in place or manner of use not impair existing water rights held by other persons. Nev.Rev.Stat. § 533.345(2); *Orr Ditch Decree.* The State Engineer ruled, as a matter of law, that this "no injury rule" means that "[j]unior appropriators are entitled to maintenance of the conditions as they existed on the date they first exercised their rights." *Ruling # 5185,* p. 64. Thus, potential impairment to junior appropriators is analyzed by comparing the impact of a proposed change against a baseline of existing conditions.

In his ruling, the State Engineer found that the baseline of "existing conditions" was that the Tribe had and has a superior right to use water in the place, manner, and amount decreed in Claims No. 1 and 2. Because the Tribe could actually use its entire water right in the place, manner, and amount decreed, the State Engineer compared the impact of the Tribe's proposed change against those physical conditions that would exist *if* the Tribe used its entire water rights as decreed.

Neither the Irrigation District nor Fallon dispute that the potential impairment to their water rights is to be determined by comparing the impact of a proposed change against existing conditions. They argue, however, that the relevant existing conditions against which the State Engineer must determine potential impairment is the Tribe's actual use (or non-use) of Truckee River water, rather than the Tribe's right to use the water.

The court finds that the State Engineer did not err. The Orr Ditch Decree establishes, as a matter of law, the "existing conditions" against which any potential impairment of other person's water rights are to be measured. Pursuant to the Decree, the Tribe's *right* to use water in the place, manner and amount described in Claims No. 1 and 2 was judicially recognized and established. Stated otherwise, the Decree established, as a matter of law, that the Tribe would not injure other person's water rights when it began using its entire water duty in the place and manner described in Claims No. 1 and 2. Further, because the Tribe's water rights have not been extinguished, the Tribe can still begin to use its full water rights as decreed without injuring other person's water rights. Accordingly, the relevant "existing conditions" against which to determine potential injury are the Tribe's decreed rights, rather than the Tribe's actual water usage (either now or at the time of the Orr Ditch Decree).

To show an *injury* to their water rights, Fallon and the Irrigation District must establish that the Tribe's use of its water duty in the place and manner proposed by the transfer applications would have an adverse impact as compared to the Tribe's use of its water duty in the place and manner presently decreed. Neither Fallon nor the Irrigation District have met this burden. At most they have shown only that their water usage would be impacted if the Tribe starts to use its full water rights, regardless of whether the Tribe applies the water pursuant to the proposed change or the Decree. Such impact to water usage, however, is not an *injury* to the water rights of either entity. Accordingly, the State Engineer did not err in finding that the proposed change will not injure either the Irrigation District's or Fallon's water rights.

*Fees*

The State Engineer granted both temporary change applications subject to the payment of statutory fees by the United States and the Tribe. The United States and the Tribe assert that they enjoy sovereign immunity from the payment of fees, and that such sovereign immunity has not been waived. The State Engineer responds that, as the Tribe and the United States are bound by the *Orr Ditch Decree* which requires their compliance with state procedural law, they must pay the statutory fees.

The State Engineer does not dispute that the United States and the Tribe enjoy sovereign immunity from the payment of fees. Accordingly, at issue is whether the United States and the Tribe have waived their immunity in connection with fees imposed pursuant to a change application of *Orr Ditch* water rights. In *United States v. Idaho*, 508 U.S. 1, 8, 113 S.Ct. 1893, 123 L.Ed.2d 563 (1993), the Supreme Court ruled that a waiver of fees by the United States must be specific as to the payment of fees. In that case, the Court ruled that the McCarran Amendment's general waiver subjecting the United States to state laws relevant to stream adjudications involving the United State's water rights was insufficient to constitute a waiver of its immunity from the payment of fees required by Idaho to participate in its Snake River adjudication.

In the present matter, the United States (and through it, the Tribe) generally agreed that further adjudications regarding the Tribe's water rights would be accomplished in the manner provided by law. Subsequently, the Ninth Circuit determined that the manner provided by law for *Orr Ditch* water rights would be pursuant to state substantive and procedural law. Critically, however, and similar to the McCarran Amendment, the *Orr Ditch Decree* lacks any specific language in which the United States (or the Tribe) waived sovereign immunity from the imposition of state fees. Accordingly, federal sovereign immunity preempts state law requiring the payment of fees in connection with the transfer applications.

*Amount of Transfer*

██ Each of the temporary change applications requested the transfer of the entire *diversion* rate specified for Claims No. 1 and 2 in the Orr Ditch Decree. The State Engineer, however, approved only the transfer of the "water duty:" that is, that amount of water specified in the Orr Ditch Decree that can be applied to the land. Claim No. 1 specifies a maximum diversion rate of 4.71 acre feet per acre (afa) at Indian Ditch and a water duty of 4.0 afa. Claim No. 2 specifies a maximum diversion rate of 5.59 afa through the Truckee Canal or any other ditch and a water duty of 4.1 afa. The Orr Ditch Decrees identifies the difference between the diversion rate and the water duty, which difference represents that amount of water lost between the diversion point and land to which the water is to be applied, as the transportation loss.

The Tribe and the United States argue that they have a right to transfer the entire *diversion* rate; that is, both the water duty and the transportation loss. The only limitation on this transfer, including the transfer of the transportation loss, is the "no injury" rule. In their papers before this court, they represent that the current diversion point for *both* claims is below the Derby Dam and is the last diversion point on the Truckee River. As such, they conclude that no other party can possibly be injured if the transportation loss awarded in the Orr Ditch Decree is transferred for in-stream use, as no other party could have relied upon the transportation loss.

Initially, the court would note that Transfer Application 67666–T, seeking the transfer of the Claim No. 2 water, identifies the *existing* point of diversion as the Derby Dam. As it appears that the Tribe has never diverted water under Claim No. 2, the record lacks any contrary evidence that the Tribe has diverted water from the Truckee River at any other point on the Truckee River *below* the Derby Dam. Accordingly, the assertion that the diversion point for Claim No. 2 is at some point on the Truckee River *below* the Derby Dam and below the diversion points for all other persons is contradicted by the Tribe's own application. (There appears to be no dispute, however, that the existing diversion point for Claim No. 1, the Indian Ditch, is below the Derby Dam and is below all other diversion points on the Truckee River.)

The ninth paragraph of the General Provisions of the Orr Ditch Decree provides:

If it shall appear at any time in regard to the *actual use* and need of water for irrigation that the amount hereinbefore *estimated* and allowed to be diverted from the river or stream into any ditch or canal is not sufficient after transportation loss to deliver to the land the flow allowed by this decree for application to the land, the allowance or flow as fixed by this decree for application to the land shall control, and there may, and hereby is allowed to be diverted from the stream a larger amount that the amount hereinbefore *estimated for diversion*

from the stream, to the extent necessary to supply to the land, after *actual transportation loss,* the flow of water allowed by this decree for application to the land. Whether *more or less* than the amount hereinbefore estimated for diversion from the stream by any ditch, *the quantity of water diverted* for irrigation shall in every case be *only such an amount as will supply to the land, after actual transportation loss, the amount of water allowed by this decree for application to the land* and the quantity needed for irrigation thereof.

This paragraph establishes that the diversion rate identified in Claims No. 1 and 2 is only an estimated diversion rate, and the *actual* diversion rate is *"only* such an amount as will supply to the land, after *actual* transportation loss, the amount of water allowed by this decree for application to the land." The State Engineer argues that the Tribe and the United States did not offer any evidence of the *actual* transportation loss. In its ruling, the State Engineer denied the transfer of the transportation loss, in part, on the basis that the Tribe and the United States had failed to provide sufficient evidence to allow the transfer of the transportation loss.

The State Engineer also did not reach the issue whether the Tribe actually could transfer its transportation loss if they had provided sufficient evidence, instead indicating that the denial of the transfer of the transportation loss was without prejudice to reconsidering the question on future applications. The court notes, however, that paragraph nine of the General Provisions makes clear that the amount of water that any person can divert from the Truckee River pursuant to the Orr Ditch Decree is the sum of that person's water duty plus the *actual* transportation loss necessary to apply the full amount of water duty. Further, each person's diversion rate is to be adjusted, whether more *or less,* to reflect the *actual* transportation loss necessary to apply the full amount of the water duty. Based upon this language, the court holds the Orr Ditch Decree awarded each person a right to a water duty representing the full amount of water that could be applied to actual use and a contingent right to an additional amount of water for actual transportation loss for the *permitted* actual use. Whenever a transfer application is granted, the contingent right to the transportation loss necessarily transfers with the underlying water duty that is being transferred. Such transfer of the contingent right to transportation loss will ensure that the underlying water duty water will not be impaired. Nevertheless, while the *right* to actual transportation loss is transferred with the underlying water duty, the *amount* of the transportation loss does not transfer. Rather, the *amount* of the transportation loss permitted for the proposed use will be the actual transportation loss resulting from the *proposed* use, *not* the loss resulting from the use that is being abandoned.

In this case, the Tribe and the United States erred in seeking the transfer of the *amount* of transportation loss that was estimated to be necessary for the old use: the application of water to the Tribe's lands. Pursuant to the Decree, the Tribe cannot transfer the *amount* of either the estimated or actual transportation loss associated with the pretransfer permitted use for its decreed water rights. Rather, the Tribe could only transfer the its underlying water duties and the *right* to sufficient water for the actual transportation loss for the proposed new uses.

In granting the change applications, the State Engineer should have first determined the actual transportation loss for the proposed use prior to granting the applications. In applying the no injury rule, the State Engineer should have determined whether the diversion of the un-

derlying water duty to the proposed use *plus* the diversion of the actual transportation loss *associated with the proposed use* would have injured any other person. If no injury would occur as a result of this total rate of diversion, the State Engineer should have granted the application in the amount of the transferred water duty plus the actual transportation loss incurred in transporting the water duty from the point of diversion to the place of application. As such, the State Engineer erred in granting a transfer of the water duty without considering the actual transportation loss that would attach to the proposed use.

While remand would generally be appropriate to permit the State Engineer to receive evidence and determine the actual transportation loss associated with the Tribe's proposed uses, it is unnecessary in this matter. As the Tribe proposes to apply its water to in-stream use, and as the transfer applications establish that the Tribe will be applying the water to the proposed use starting at the point of diversion, no actual transportation losses can occur. Accordingly, the State Engineer did not err in granting each transfer application only in the amount of the respective water duty.

*Manner of Implementation*

The United States and the Tribe challenged the State Engineer's limitations as to the manner in which the proposed changes could be implemented. At oral arguments, however, they agreed to accept the State Engineer's limitations as to this temporary transfer application without waiving their position and arguments as to future transfer applications. Accordingly, the issue is moot.

*Improper Use of Water by Tribe*

Fallon and the Irrigation District argue that the Tribe has been applying water to its land inconsistent with its Decreed water rights. The State Engineer ruled that the issue was appropriate for resolution by the Federal Water Master. The Court agrees.

Therefore,

State Engineer Ruling #5185 is AFFIRMED in part, and REVERSED in part, consistent with this opinion. Applications 67666–T is granted in the amount of 11,254.5 acre-feet annually. Application 68157–T is granted in the amount of 8,420 acre-feet annually. The water rights shall be exercised as set forth in either proposed Alternative 3 or 4 as described in the Environmental Assessment, that is the water will be taken in equal amounts over a certain number of months. Applications 67666–T and 68157–T are hereby granted in the amounts identified subject to:

1) Existing rights;

2) Continuing jurisdiction and regulation by the Orr Ditch Decree Court and the Federal Watermaster;

3) Applications 67666–T and 68157–T expire one year from the date of the issuance of the permit;

4) Filing of the map required in order to show what lands under Claim No. 1 will remain in irrigation.